RECEIVED IN
COURT OF CRIMINAL APPEALS

June 2, 2015

ABEL ACOSTA, CLERK

WR-73,484-02
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 6/1/2015 5:22:49 PM
Accepted 6/2/2015 8:06:32 AM
ABEL ACOSTA
CLERK

**IN THE**
**COURT OF CRIMINAL APPEALS**
**AUSTIN, TEXAS**

| | | |
|---|---|---|
| EX PARTE | § | |
| | § | |
| | § | NO. WR-73,484-02 |
| | § | |
| NEAL HAMPTON ROBBINS | § | |

_____

**AMICUS CURIAE BRIEF**
**OF THE INNOCENCE PROJECT**

_____

**BARRY C. SCHECK**
**NY Bar Number: 1634765**

**BRYCE BENJET**
**TX Bar Number: 24006829**

**THE INNOCENCE PROJECT**
**40 WORTH STREET**
**SUITE. 701**
**NEW YORK, NEW YORK 10013**
**(212) 364-5340**
**(212) 364-5341 FAX**

*Attorneys for Amicus Curiae*

# **TABLE OF CONTENTS**

**Page**

Table of Contents ............................................................................................i

Index of Authorities ...................................................................................ii-iv

Interests of Amicus Curiae ..............................................................................2

A.      Article 11.073 Creates a Needed Remedy Where a Criminal
        Conviction Is Based on Unreliable Scientific Evidence ....................3

        1.      Unreliable Scientific Evidence Is a Leading Cause of
                Wrongful Convictions ..............................................................3

        2.      Article 11.073 Represents a Broad Legislative
                Response to the Problem of Unreliable Scientific
                Evidence ....................................................................................7

B.      Article 11.073 Applies to Dr. Moore's Changed Medical
        Opinion ........................................................................................9

C.      Article 11.073 Balances the Interests of Finality and
        Accuracy in Criminal Cases ...........................................................14

Conclusion and Prayer ...................................................................................15

Certificate of Service ....................................................................................17

Certificate of Compliance ..............................................................................18

# INDEX OF AUTHORITIES

**Cases** **Page**

*Brooks v. State*,
323 S.W.3d 893 (Tex. Crim. App. 2010) ......................................................7

*City of Keller v. Wilson*,
168 S.W.3d 802 (Tex. 2005) ........................................................................8

*Coble v. State*,
330 S.W.3d 253 (Tex. Crim. App. 2010) ......................................................5

*Daubert v. Merrell Dow Pharm., Inc.,*
509 U.S. 579 (1993*)* .................................................................................6, 8

*Dist. Attorney's Office for Third Judicial Dist. v. Osborne*,
557 U.S. 52 (2009) ......................................................................................15

*Ex Parte Brooks*,
219 S.W.3d 396 (Tex. Crim. App. 2007) .................................................7, 15

*Ex Parte Calderon*,
309 S.W.3d 64 (Tex. Crim. App. 2010) ......................................................11

*Ex Parte Robbins*, No. WR-73,484-02, 2014 WL 6751684,
(Tex. Crim. App. November 26, 2014) ...................................................Passim

*Ex Parte Coty*,
418 S.W.3d 597 (Tex. Crim. App. 2014) ......................................................4

*Jelinek v. Casas*,
328 S.W.3d 526 (Tex. 2010) ........................................................................8

*Kelly v. State*,
824 S.W.2d 568 (Tex. Crim. App. 1992) ......................................................8

*Rosen v. Ciba Geigy Corp.*,
78 F.3d 316 (7th Cir. 1996) ..........................................................................8

*Schlup v. Delo*,
513 U.S. 298 (1995) ...................................................................15

*Watson v. State*,
204 S.W.3d 404 (Tex. Crim. App. 2006) ....................................7

*Winfrey v. State*,
323 S.W.3d 875 (Tex. Crim. App. 2010) ....................................8

## Codes and Rules

Tex. Code Crim. Proc. Art. 11.073 .......................................Passim

Tex. R. Evid. 702 ..................................................................8, 14

## Legislative History

House Comm. On Crim. Jurisprudence, Bill Analysis,
84th Leg. R.S. (bill heard on April 22, 2015) ...............................13

H.J. of Tex. 83rd Leg., R.S. 3407-08 (2013) .................................12

H.J. of Tex. 84th Leg., R.S. 2984 (2015) ......................................13

S.J. of Tex. 83rd Leg., R.S. 588 (2013) .........................................12

S.J. of Tex. 84th Leg., R.S. 1884 (2015) .......................................13

Senate Research Center, Bill Analysis,
Tex. H.B. 3724, 84th Leg. R.S. (May 15, 2015) ...........................13

Witness List, Senate Committee on Criminal Justice,
Tex. S.B. 344, 83rd Leg. R.S. (March 12, 2013) ..........................11

## Published Reports and Articles

Brian Rogers, *Ex-Crime Lab Analyst Told HPD Colleagues of
Wrongdoing*, Houston Chronicle (June 25, 2014) ..........................4

David L. Faigman, *The Daubert Revolution and the Birth of Modernity: Managing Scientific Evidence in the Age of Science*, 46 U.C. Davis L. Rev. 893, 928 (2013) ........................................................8

Hon. Donald E. Shelton et. al., *A Study of Juror Expectations and Demands Concerning Scientific Evidence: Does the "CSI Effect" Exist?*, 9 Vand. J. Ent. & Tech. L. 331, 357 (2006) ..................5

Michael R. Bromwich, *Final Report of the Independent Investigator for the Houston Police Department Crime Laboratory and Property Room* (June 13, 2007) ....................................................4

National Research Council of the National Academies, *Strengthening Forensic Science in the United States: A Path Forward* (2009) ................3, 6

Simon A. Cole & Rachel Dioso-Villa, *Investigating the "CSI Effect' Effect: Media and Litigation Crisis in Criminal Law*, 61 Stan. L. Rev. 1335, 1351-52 (2009) ........................................................5

Strengthening Forensic Science, NACDL Austin, Texas (2010) ...................6

Texas Criminal Justice Integrity Unit 2009 Annual Report of Activities.......5

## IN THE
## COURT OF CRIMINAL APPEALS
## AUSTIN, TEXAS

EX PARTE          §
                     §
                     §          **NO. WR-73,484-02**
                     §

**NEAL HAMPTON ROBBINS**    §

_____

## AMICUS CURIAE BRIEF
## OF THE INNOCENCE PROJECT

_____

**TO THE HONORABLE JUDGES OF THE COURT OF CRIMINAL APPEALS:**

**NOW COMES** The Innocence Project and submits this Amicus Curiae Brief in the above styled and numbered case. The Innocence Project submits this Brief in support of the Applicant Neal Robbins because the proper construction of Article 11.073 is vital to ensuring an avenue for relief where faulty scientific evidence has led to a wrongful conviction. Consistent with the clear legislative history and the plain language of the statute, this Court should confirm that Article 11.073 applies to cases, like Robbins, where the scientific evidence relied on by the State is contradicted by a new and credible scientific opinion.

1

## Interest of Amicus Curiae

The Innocence Project, Inc. is a nonprofit legal clinic and resource center created by Barry C. Scheck and Peter J. Neufeld. Founded at the Benjamin N. Cardozo School of Law in 1992, the Innocence Project provides *pro bono* legal services to indigent prisoners for whom post-conviction DNA testing of evidence can yield conclusive proof of innocence. The Innocence Project pioneered the post-conviction DNA litigation model that has to date exonerated 329 innocent persons, and served as counsel or provided critical assistance in a majority of these cases.

The advent of forensic DNA testing and the use of such testing to review criminal convictions have provided scientific proof that our system convicts innocent people, and that wrongful convictions are not isolated or rare events. DNA testing has, thus, opened a window into wrongful convictions so that we may study the causes of this injustice and recommend practices to minimize the chance of its occurrence. In roughly half of the 329 recognized DNA exonerations, the misapplication of forensic science has played a role in convicting the innocent. In these cases, forensic scientists presented fraudulent, exaggerated, or otherwise unreliable scientific evidence which was relied on by the judge or jury resulting in a wrongful conviction. Because of this background, the Innocence Project

has a particularly strong interest in ensuring that forensic evidence used to obtain convictions is both accurate and reliable.  This interest is directly implicated in the construction of Article 11.073 of the Texas Code of Criminal Procedure at issue in Mr. Robbins's case.

**A.**     **Article 11.073 Creates a Needed Remedy Where a Criminal Conviction is Based on Unreliable Scientific Evidence.**

**1.**     **Unreliable Scientific Evidence Is a Leading Cause of Wrongful Convictions.**

The Texas Legislature enacted Article 11.073 against the backdrop of a growing recognition that unreliable scientific evidence has led to wrongful convictions.  *See Ex parte Robbins*, No. WR-73,484-02, 2014 WL 6751684, * 14-17 (Tex. Crim. App. November 26, 2014) (Cochran, J., concurring) (*Robbins II*).[1]  In some cases, entire scientific disciplines have been either superseded or discredited by advancements in science.  *See id*. (discussing discredited disciplines including arson investigation, toolmark evidence, bullet lead analysis, microscopic hair analysis, forensic odontology); *see also generally* National Research Council of the National Academies, *Strengthening Forensic Science in the United States: A Path Forward* (2009) ("NAS Report").  However, Texas has also been plagued by instances in which forensic experts employed by government crime

---

[1] Page references in the *Robbins II* opinion will be made to the Westlaw publication, a copy of which is attached as an appendix to this Brief.

laboratories provided unreliable scientific evidence arising from perfectly valid scientific disciplines. These cases have ranged from instances of incompetence and sloppy forensic work to outright fraud. *See e.g.* Michael R. Bromwich, *Final Report of the Independent Investigator for the Houston Police Department Crime Laboratory and Property Room* (June 13, 2007) (discussing pervasive problems in HPD crime lab, particularly systemic misapplication and misunderstanding of serology tests); Brian Rogers, *Ex-Crime Lab Analyst Told HPD Colleagues of Wrongdoing*, Houston Chronicle (June 25, 2014) (HPD lab analyst who worked on 51 murder cases accused of lying, improper procedure, and tampering); *Ex parte Coty*, 418 S.W.3d 597, 598 (Tex. Crim. App. 2014) (describing misconduct by DPS crime lab employee in falsifying drug test).

This Court has also acknowledged the great weight jurors place on scientific evidence (especially from medical doctors), and that jurors tend to defer to an expert's credentials rather than content when the scientific opinions offered are complex:

> studies have shown that juror reliance on an expert's credentials is directly proportional to the complexity of the information represented: the more complex the information, the more the jury looks to the background, experience, and status of the expert himself rather than to the content of his testimony. There

> is also some evidence that jurors value medical expertise higher than other scientific expertise . . . .

*Coble v. State*, 330 S.W.3d 253, 281 (Tex. Crim. App. 2010). Studies also show that jurors have grown to expect scientific evidence in criminal cases, thus adding pressure on prosecutors to present scientific evidence even when its reliability may be in question. *See* Hon. Donald E. Shelton et. al., *A Study of Juror Expectations and Demands Concerning Scientific Evidence: Does the "CSI Effect" Exist?*, 9 Vand. J. Ent. & Tech. L. 331, 357 (2006) (discussing high expectation of jurors for scientific evidence); Simon A. Cole & Rachel Dioso-Villa, *Investigating the "CSI Effect' Effect: Media and Litigation Crisis in Criminal Law*, 61 Stan. L. Rev. 1335, 1351-52 (2009) (describing survey showing prosecutors requested additional forensic tests based on the perception that jurors have heightened expectations for forensic proof).

Despite the importance of scientific evidence to juries and its role in wrongful convictions, this Court's Criminal Justice Integrity Unit reported in 2009 that half of the criminal law judges in Texas—the gatekeepers for reliability— "received zero hours of forensic science training last year, and many judges requested additional training on the standards for reliability of scientific evidence." *See* Texas Criminal Justice Integrity Unit 2009 Annual Report of Activities at 6. The same deficiencies were recognized by the

National Association of Criminal Defense Lawyers in a 2010 report issued

from Austin, Texas which acknowledged that all legal professionals,

including defense lawyers who are tasked with challenging unreliable

scientific evidence, "generally lack the scientific expertise necessary to

comprehend and evaluate forensic evidence in an informed manner."

Strengthening Forensic Science, NACDL Austin, Texas (2010); *see also*

*NAS* Report at 12.

The Supreme Court acknowledged the double-edged character of

scientific evidence which can both illuminate and confuse:

> Expert evidence can be both powerful and quite misleading
> because of the difficulty in evaluating it.

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595, 113 S. Ct. 2786,

2798, 125 L. Ed. 2d 469 (1993). Considering the importance placed on

scientific evidence by juries and the risk that such evidence can be

misleading, it is no wonder that unreliable scientific evidence has lead to

wrongful convictions. A review of the 329 recognized DNA exonerations

shows that unreliable forensic science contributed to 47% of wrongful

convictions.[2] Among the 1606 exonerations recognized by the National

---

[2]http://www.innocenceproject.org/causes-wrongful-conviction (last visited 5/28/15)

Registry of Exonerations, 23% involved false or misleading forensic science.[3]

### 2. Article 11.073 Represents a Broad Legislative Response to the Problem of Unreliable Scientific Evidence.

Judge Cochran's concurring opinion identifies two cases which led to the enactment of Article 11.073 by the 83rd Legislature. In *Robbins I* and *Ex parte Henderson*, seven members of this Court agreed that "Texas law lacked clarity in dealing with instances in which critical scientific evidence supporting the conviction—either the scientific filed itself or the expert's original opinion—had been discredited." *Robbins II* at *19. In addition to the specific calls for reform in the cases dealing with unreliable scientific evidence identified by Judge Cochran above, members of this Court also anticipated Legislative action where this Court's dedication to jury deference and "hard minded application of standards of review"[4] could result in wrongful convictions. *See Watson v. State*, 204 S.W.3d 404, 449 (Tex. Crim. App. 2006) (Cochran, J., dissenting joined by Keller, C.J., and JJ., Keasler and Hervey) (advocating for abandonment of factual sufficiency

---

[3]https://www.law.umich.edu/special/exoneration/Pages/ExonerationsContribFactorsByCrime.aspx (last visited 5/28/15).
[4]*Brooks v. State*, 323 S.W.3d 893, 923 (Tex. Crim. App. 2010) (Cochran, J., concurring).

review and explaining that concerns about manifestly unjust convictions could be handled through legislative action).[5]

While our rules of evidence encourage the consideration of relevant and reliable scientific evidence pursuant to Rule 702, courts have also noted that judges are not well equipped to correctly evaluate difficult issues of science. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 599 (1993) (Rehnquist, C.J., and Stevens, J., concurring and dissenting) (*Daubert* factors involve consideration of issues "far afield from the expertise of judges"); *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996) ("it is a daunting task for judges who do not have a scientific background (and most do not) to decide whether a scientist's testimony is real science or not"); *Kelly v. State*, 824 S.W.2d 568, 576 (Tex. Crim. App.

_____

[5] The need for a safety valve to remedy invalid scientific evidence in criminal cases is highlighted when contrasted to the greater scrutiny afforded to such evidence in the civil context. Studies have documented that civil courts are generally more rigorous in screening out questionable scientific proof. *See* David L. Faigman, *The Daubert Revolution and the Birth of Modernity: Managing Scientific Evidence in the Age of Science*, 46 U.C. Davis L. Rev. 893, 928 (2013) (reviewing research comparing civil and criminal court decisions on admissibility of scientific evidence). This different approach is evident in Texas law as well. For example, the Texas Supreme Court has barred any consideration of unsupported scientific evidence even absent an objection:

> [I]f no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection. '[A] claim will not stand or fall on the mere *ipse dixit* of a credentialed witness.' "

*Jelinek v. Casas*, 328 S.W.3d 526, 536 (Tex. 2010); see also *City of Keller v. Wilson*, 168 S.W.3d 802, 812-13 (Tex. 2005) (invalid expert testimony "incompetent" and should be disregarded in sufficiency of the evidence analysis). By contrast, this Court's review of judgments based on unsupported expert testimony has been more lenient, even when finding the evidence to be insufficient. *See, e.g., Winfrey v. State*, 323 S.W.3d 875, 885 (Tex. Crim. App. 2010) (declining to examine validity of dog scent lineup absent objection at trial and finding such evidence to raise "strong suspicion of guilt" that, despite its unproven reliability, can support a conviction when corroborated by other evidence).

1992) (Clinton, J., dissenting) (expressing concern that incorrect decision admitting unreliable science will result in injustice and that Texas criminal justice system lacks procedures to meaningfully test scientific evidence). In recognition of this unique vulnerability in cases involving scientific evidence, Article 11.073 creates a safety valve for criminal convictions based on scientific evidence presented at trial that is now undermined by either advancements in science or additional scientific evidence that contradicts that relied on by the State.

**B.      Article 11.073 Applies to Dr. Moore's Changed Medical Opinion.**

Consistent with the two-fold problem of "bad science" and "bad scientific testimony"[6] which has led to wrongful convictions, the lead section of Article 11.073 identifies two distinct types of evidence that can form the basis for relief under this statutory new trial remedy:

(1) scientific evidence that was not available to be offered at trial; <u>or</u>

(2) scientific evidence that contradicts the scientific evidence relied on by the State at trial.

Section (a)(1), which focuses on evidence unavailable at trial, encompasses the "bad science" category. For example, advancements in scientific technology such as the advent of forensic DNA testing and other more

---

[6] *Robbins II* at *15 ("it is not surprising to see 'bad' science and 'bad' scientific testimony in our courtrooms")

9

powerful modern forensic tools developed after a conviction would fall into this category. This category would also include advances within a scientific field such as the methods of arson investigation or the understanding of biomechanics.

Section (a)(2) encompasses a separate category of evidence, scientific evidence which "contradicts" the scientific evidence relied on by the State at trial. Tex. Code Crim. Proc. Art. 11.073 § (a)(2). The Legislature's use of "or" indicates that the contradicting evidence discussed in section (a)(2) means something different from that referred to in section (a)(1). Although the full breadth of section (a)(2) need not be determined in this case, Dr. Moore's changed medical opinion clearly falls within it because her current opinion contradicts, and, so necessarily discredits, the expert opinion she offered at trial.

Dr. Moore's changed medical opinion likewise meets the requirement under section (b)(1)(A) that the scientific evidence was "not ascertainable through the exercise of reasonable diligence by the convicted person." At Mr. Robbins's 1999 trial, Dr. Moore testified that it was her medical opinion that Tristen Rivet died from compression asphyxia—a homicide. *See Robbins II* at \*3. Because Tristen was in Mr. Robbins's sole care at the

time, he was convicted of murder. *Id*. at *4. In 2007, Dr. Moore contradicted this opinion to acknowledge that the cause of death was "undetermined." *See id*. *5. This was the first time that Dr. Moore had expressed her changed opinion, and Mr. Robbins acting with reasonable diligence could not have ascertained that Dr. Moore would change her opinion prior to the time that she expressed this opinion. *Cf Ex parte Calderon*, 309 S.W.3d 64, 70 (Tex. Crim. App. 2010) (witness recantation not available through exercise of due diligence where recantation was unknown to defendant).

This construction of the plain language of the statute is supported by the legislative history of Article 11.073 in the 83rd Legislature. The need for a law to address Mr. Robbins's case was discussed in committee by counsel for Mr. Robbins as well as the former Montgomery County District Attorney who handled the Robbins prosecution and initial post-conviction. *See Robbins II at *27* (Keasler, J., dissenting). There was no opposing view expressed at that hearing or any other legislative forum, despite the presence of a representative of the Texas District and County Attorneys Association who registered "on" the bill but did not testify. *See* Witness List, Senate Committee on Criminal Justice, Tex. S.B. 344, 83rd Leg. R.S. (March 12, 2013). No representative of Montgomery County voted against the bill,

11

which passed unanimously in the House and with only three "nays" in the Senate. *See* S.J. of Tex. 83rd Leg., R.S. 588 (2013); H.J. of Tex. 83rd Leg., R.S. 3407-08 (2013).

Any question as whether the 83rd Legislature intended for Article 11.073 to apply to the facts of Mr. Robbins's case has been resolved by the 84th Legislature's recent passage of a bill intended to codify this Court's decision which is currently on rehearing. HB 3724 was expressly intended to codify this Court's November 26, 2014 decision in Mr. Robbins's case. The Bill Analysis produced in the Senate makes this unmistakably clear:

**AUTHOR'S / SPONSOR'S STATEMENT OF INTENT**
H.B. 3724 codifies a recent Court of Criminal Appeals decision within the discredited Forensic Science Law that I authored and we passed last session. The decision held that a defendant may have their convictions reexamined if an expert who testified at the defendant's trial later rejects the testimony, casting doubt on the integrity of the conviction.

• This addition is to the current law allowing an individual to challenge their convictions if they are based on debunked or otherwise discredited scientific evidence that was used in their trial. It was passed after an alarming number of wrongful convictions that resulted from "junk science" and "junk scientists."

• A recent case in the Court of Criminal Appeals tested whether the law applies in cases where a scientific expert sincerely thought something was true at the time the expert testified, but the expert's understanding and opinions changed

> after trial based on new knowledge and improvements to the science that had supported the expert's former opinion.
>
> H.B. 3724 simply codifies the recent court decisions and clarifies that the legislative intent in enacting Article 11.073 included not only discredited science but also the testimony that was based on discredited science.

Senate Research Center, Bill Analysis, Tex. H.B. 3724, 84th Leg. R.S. (May 15, 2015).  The Bill Analysis by the House Committee on Criminal Jurisprudence likewise expresses the original intent of Article 11.073 to encompass the facts of Mr. Robbins's case:

> BACKGROUND AND PURPOSE
>
>  Informed observers note that current law allows for the reexamination of certain cases based on new scientific evidence and requires a court, in finding whether new scientific evidence exists, to consider whether the scientific knowledge or method on which the relevant scientific evidence is based has changed. The observers contend that a recent Texas Court of Criminal Appeals opinion held that a change in the scientific knowledge of a testifying expert would be a basis for habeas relief under the law. C.S.H.B. 3724 seeks to codify this decision.

House Comm. On Crim. Jurisprudence, Bill Analysis, 84th Leg. R.S. (bill heard on April 22, 2015).  With this unambiguous statement of legislative intent, HB 3724 was passed unanimously in the Senate and with only three "nay" votes in the House.  *See* S.J. of Tex. 84th Leg., R.S. 1884 (2015); H.J. of Tex. 84th Leg., R.S. 2984 (2015).  All of the elected representatives of Montgomery County voted in favor of the bill.  *See id*.

13

Considering (1) the plain language of Article 11.073, (2) the unambiguous statement of the legislative intent in the Senate committee hearing on SB 344 before the 83rd Legislature, and (3) and the passage of HB 3724 by the 84th Legislature, there is simply no question that the statute applies to Dr. Moore's changed testimony in Mr. Robbins's case.

**C.     Article 11.073 Balances the Interests of Finality and Accuracy in Criminal Cases.**

The Legislature's decision to provide a remedy in cases involving both changed science and the changed opinion of a scientist strikes a balance between the interests in the finality of criminal convictions and the need to remedy wrongful convictions. The statute applies to a broad category of scientific evidence, but that scientific evidence has to be admissible. *See* Tex. Code Crim. Proc. Article 11.073(b)(1)(B). This admissibility requirement carries with it an independent gate-keeping inquiry by the trial court to ensure that any new scientific evidence presented under the law is reliable and relevant to the case. *See* Tex. R. Evid. 702. Thus, an expert can't simply change her opinion on a whim—there must be a valid scientific underpinning to the new opinion or other scientific evidence. A changed but unreliable new opinion from an expert could hardly be the basis for changing the outcome of a case.

14

Furthermore, the statute limits relief to those few cases in which the new scientific evidence would "probably" change the outcome of the case. Although this standard is short of the *Elizondo* "clear and convincing" test for innocence, evidence establishing that a person would probably not have been convicted is universally equated with a miscarriage of justice. *See Schlup v. Delo*, 513 U.S. 298, 315 (1995) (evidence that defendant probably would not have been convicted brings case within narrow class of cases implicating miscarriage of justice); *Ex parte Brooks*, 219 S.W.3d 396, 400 (Tex. Crim. App. 2007) (same). Accordingly, Article 11.073 will not result in the reversal of every conviction involving discredited scientific evidence. The finality of a conviction is only disturbed in the rare instances when unreliable scientific evidence was "probably" the reason a defendant was convicted.

## Conclusion and Prayer

Advancements in science have, in large part, brought greater reliability to the criminal justice system both in convicting the guilty and exonerating the innocent. *See Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 55 (2009). But experience shows that scientists can and do get it wrong. The recent passage of HB 3724 by supermajorities in both the Texas House and Senate confirms the intent that Article 11.073

15

encompass a scientist's changed opinion when (1) the retracted opinion is reliable and (2) the retracted scientific evidence was the primary evidence of a person's guilt, is consistent with the stated legislative intent of Article 11.073. The Innocence Project therefore asks this Court to uphold the intent of the People of Texas to ensure that only the best available science is used to convict; and where convictions are found to have been based on unreliable scientific evidence, courts have the tools necessary to remedy a miscarriage of justice.

Respectfully submitted,

BARRY C. SCHECK
NY Bar Number: 1634765

BRYCE BENJET
TX Bar Number: 24006829

THE INNOCENCE PROJECT
40 WORTH STREET
SUITE. 701
NEW YORK, NEW YORK 10013
(212) 364-5340
(212) 364-5341 FAX

**<u>CERTIFICATE OF SERVICE</u>**

      I, the undersigned, hereby certify that a true and correct copy of the foregoing Amicus Curiae Brief by the Innocence Project was mailed by Federal Express to the Montgomery County District Attorney's Office, 207 W. Phillips Flr. 2, Conroe, Texas 77301, and Brian Wice, Attorney for Applicant Neal Hampton Robbins, The Lyric Centre, 440 Louisiana, Suite 900, Houston, Texas 77002-1635, on this the 1st day of June, 2015. This brief was also e-filed pursuant to the applicable rules of the Court of Criminal Appeals.

                        /s/ Bryce Benjet_____
                        BRYCE BENJET

# CERTIFICATE OF COMPLIANCE

Pursuant to Tex. R. App. Proc. 9.4(e)(i)(2), undersigned counsel certifies that this brief complies with the type-volume limitations of Tex. R. App. P. 9.4(e)(i)(2).

1.     This brief complies with the type-volume limitation of Tex. R. App. P. 9.4(e)(i)(2) because this brief contains 3,732 words, excluding the parts of the brief exempted by Tex. R. App. P. 9.4(e)(i)(2).

2.     This brief complies with the typeface requirements of Tex. R. App. P. 9.4(e) and the type style requirements of Tex. R. App. P. 9.4(e) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.

/s/ Bryce Benjet_____
BRYCE BENJET

# APPENDIX A

**2014 WL 6751684**
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN
RELEASED FOR PUBLICATION IN THE
PERMANENT LAW REPORTS. UNTIL RELEASED,
IT IS SUBJECT TO REVISION OR WITHDRAWAL.

Court of Criminal Appeals of Texas.

Ex Parte Neal Hampton Robbins, Applicant

NO. WR–73,484–02 | Delivered November 26, 2014
| Rehearing Granted May 13, 2015

**Synopsis**
**Background:** After conviction and life sentence for capital
murder were affirmed on direct appeal, 88 S.W.3d 256,
and initial application for writ of habeas corpus was
denied, 2013 WL 6212218, defendant filed second
application for habeas relief, based on new scientific
evidence that was not available at time of trial. The 410th
District Court, Montgomery County, recommended the
grant of new trial.

**Holdings:** The Court of Criminal Appeals, Womack, J.,
held that:

[1] medical examiner's revised opinion that cause and
manner of child victim's death were "undetermined," was
new scientific evidence that contradicted scientific
evidence relied upon by State at trial;

[2] medical examiner's revised opinion was new scientific
evidence based on change of scientific knowledge that was
not available at time of original habeas application; and

[3] defendant would not have been convicted of capital
murder if new evidence had been made available at trial, as
grounds for successive habeas relief.

Writ issued; judgment of conviction and sentence vacated;
remanded.

Johnson, J., filed concurring opinion.

Cochran, J., filed concurring opinion in which Johnson and

Price, JJ., joined.

Keller, P.J., filed dissenting opinion in which Hervey, J.,
joined.

Meyers, J., filed dissenting opinion.

Keasler, J., filed dissenting opinion.

West Headnotes (5)

**[1]**      **Habeas Corpus**
       ⚲ Newly discovered evidence

Medical examiner's post-trial reconsideration of
initial conclusion from autopsy that cause of
child victim's death was asphyxia by
strangulation and that manner of death was
homicide, following which she concluded that
cause and manner of death were "undetermined,"
was new scientific evidence that contradicted
scientific evidence relied upon by State at trial
which was not available at time of original
application, as basis for obtaining successive
habeas review. Tex. Crim. Proc. Code Ann. art.
11.073(a)(2).

Cases that cite this headnote

**[2]**      **Habeas Corpus**
       ⚲ Change in facts or law; new evidence

The Court of Criminal Appeals may consider a
subsequent habeas application only if the current
claims and issues have not been and could not
have been presented previously in an original
application or in a previously considered
application because the factual or legal basis for
the claim was unavailable on the date the
applicant filed the previous application.

Cases that cite this headnote

**[3]** **Habeas Corpus**
&#128273;Newly discovered evidence

An applicant seeking habeas relief based on newly available scientific evidence that was not available at trial must establish that the facts he alleges are at least minimally sufficient to bring him within the ambit of that legal basis for relief. Tex. Crim. Proc. Code Ann. art. 11.073.

Cases that cite this headnote

**[4]** **Habeas Corpus**
&#128273;Newly discovered evidence

Medical examiner's post-trial revision of her original conclusion to which she testified at trial for capital murder that cause of child victim's death was asphyxia by strangulation and that manner of death was homicide to state that, while suspicious, both cause and manner of victim's death were "undetermined," which revised opinion was based on review of medical evidence and more experience in field, was new scientific evidence based on change of scientific knowledge that was not available at time of original habeas application, as grounds for obtaining successive habeas review. Tex. Crim. Proc. Code Ann. art. 11.073.

Cases that cite this headnote

**[5]** **Habeas Corpus**
&#128273;Newly discovered evidence

Medical examiner's post-trial revision of her original conclusion to which she testified at trial for capital murder that cause of child victim's death was asphyxia by strangulation and that manner of death was homicide to state that, while suspicious, both cause and manner of victim's death were "undetermined," was sufficient to show that defendant would not have been convicted of capital murder if such evidence had been made available at trial, as grounds for habeas relief, setting aside conviction and sentence, and remanding for new trial, where medical examiner's trial testimony was only evidence presented by State to show that victim's death was homicide. Tex. Crim. Proc. Code Ann. art. 11.073.

Cases that cite this headnote

**ON APPLICATION FOR A WRIT OF HABEAS CORPUS FROM MONTGOMERY COUNTY**

**Attorneys and Law Firms**

Brian W. Wice, Attorney at Law, Houston, TX, for Applicant.

William J. Delmore III, Assistant District Attorney, Conroe, TX, for the State.

**Opinion**

Womack, J., delivered the opinion of the Court, in which Price, Johnson, Cochran, and Alcala, JJ., joined. Johnson, J., filed a concurring opinion.

**\*1** The applicant, Neal Hampton Robbins, was convicted in 1999 of the capital murder of his girlfriend's seventeen-month-old daughter, Tristen Rivet. The State did not seek the death penalty, and upon conviction the applicant was sentenced to life in prison. We affirmed the judgment and sentence on direct appeal.[1]

The applicant filed his first application for a writ of habeas corpus in 2011, alleging actual innocence based on new evidence and due process claims for the use of false testimony, which we denied.[2]

The applicant filed this subsequent application for a writ of habeas corpus on September 3, 2013, pursuant to article 11.073 of the Texas Code of Criminal Procedure. Article 11.073 was passed during the 2013 legislative session and became effective on September 1, 2013. There are no factual changes in the applicant's case since the filing of his first application. In both applications he argued he was entitled to a new trial because the medical examiner who testified for the prosecution, Dr. Patricia Moore, could no

longer stand by her trial testimony regarding the cause of death. The only difference between the two applications is the enactment of the new law upon which the applicant now relies. Based on article 11.073, the applicant argues he is entitled to relief because scientific evidence relied on by the State at trial has been contradicted by relevant scientific evidence that was unavailable at trial, and if it had been presented at trial he would not have been convicted.

We shall grant the applicant's request for relief.

## Background

The relevant facts and procedural background have not changed since the applicant's first application for habeas corpus was denied by this Court in 2011. As we summarized previously, the facts as developed at trial and during original habeas proceedings are as follows:

> The victim resided with her mother, Barbara Hope, and her mother's boyfriend, Applicant, at the home of Applicant's mother, Bonni Morris. Applicant and Hope had a volatile relationship, frequently separating and reuniting. Witnesses suggested that both suffered from depression. When seeking group-type counseling, Applicant told a counselor that he did not know what he would do if things got worse, and he feared he would hurt Hope if they stayed together.

> Testimony indicated that Tristen and Applicant had a good relationship, but that changed in the months leading to Tristen's death. Applicant's personality began to change after he started taking pain medication for injuries received in a serious car accident. Then, beginning in November 1997, Tristen suffered injuries on three separate occasions while being cared for by Applicant: a bruise under the eye, an injury to her leg or ankle, and finally, a series of bruises across her face. Also, testimony suggested that in early 1998, Tristen became afraid of Applicant. Hope stated that Tristen "didn't seem to care too much for [Applicant] anymore" and seemed afraid of him. Tristen's injuries and change in behavior led neighbor Rhonda Bethune and babysitter Helen McDaniel[3] to express concern that Applicant was hurting Tristen. However, the defense presented several witnesses, including Morris and Applicant's grandmother, brother, and sister-in-law, who stated that Tristen and Applicant had a very loving, father-daughter type of relationship.

**\*2** On the morning of her death, Tristen was suffering from a cold but was otherwise in good health. Hope, accompanied by Morris, left the house at approximately 11:30 a.m. to attend appointments and run errands. Applicant was entrusted with Tristen's care. Applicant's parole officer, Tim Hurst, visited Applicant between 1:26 p.m. until 2:00 p.m. Hurst testified that he observed Tristen walking around and eating animal crackers, and Tristen asked for some red punch, which Applicant gave her from his own glass. Applicant's brother arrived for a visit at approximately 1:45 p.m. and remained at the home until about 2:20 p.m.

Applicant paged Hope between 3:30 and 4:00 p.m. When Hope called, Applicant sounded "shaky" and "excited" and told her to hurry back to the house because he "had to go and had things to do." When Hope and Morris arrived home between 4:00 and 4:30 p.m., Applicant told them that he had laid Tristen down for a nap shortly after they spoke on the telephone. Applicant stated that he had to leave, and an argument ensued with Hope about Applicant's frequent absences. Applicant and Hope walked to the store a couple of blocks away and then returned home. During that time, Morris was alone with Tristen. She testified that she was going through bills and talking on the phone, as could be supported by phone records.

After Applicant departed, Hope watched a news broadcast on television. At about 5:40 p.m., Hope checked on Tristen and thought that the child was sleeping. At 6:00 p.m., Hope returned to Tristen's room to wake her up. She saw that the baby was lying in her bed with a pillowcase covering one eye, part of her nose, and her mouth. When Hope moved the pillowcase, she saw that Tristen's lips were blue. Upon picking her up, Hope found that Tristen's body was cold and that she was not breathing.

Hope cried for Morris to call 9–1–1 for assistance and carried Tristen into the living room. There she held Tristen on her lap and tried to breath into her mouth. A pink fluid gurgled up from Tristen's mouth and nose, and Hope inserted a finger into Tristen's throat to attempt to dislodge any object stuck in her throat. Hope then carried Tristen outside, where she yelled for someone to assist her and placed the child on a patch of well-groomed lawn near the front door. Morris and a neighbor's daughter, Pamela Garrison, attempted to perform CPR on Tristen. Morris blew into Tristen's

mouth while Garrison pushed with very little force upon the child's abdomen three or four times, using the palm of her hand. Garrison testified that Tristen's skin felt very cold, and she did not hear any air coming out of the baby. Another neighbor, Jackie Sullivan, who had previously worked as an emergency medical technician, approached and told Morris and Garrison to stop because they were performing CPR too forcefully, given the size of the child. Sullivan made a statement to the effect that they would kill the child if she was not dead already. She observed that Tristen was not breathing, that her body was cold, and that her lips were bluish-purple, circumstances leading her to believe that Tristen was dead at that time. Still, Sullivan started to perform infant CPR with two fingers.

An ambulance arrived at 6:08 p.m., and paramedic Elizabeth Fredregill placed Tristen on a stretcher. After several unsuccessful attempts, a breathing tube was inserted into Tristen's larynx. Fire department personnel performed CPR and administered epinephrine during the trip to the hospital. Fredregill observed that Tristen was pale and cold to the touch, that her neck was stiff, and that there was vomit in her airway, and she formed an opinion that Tristen was dead based on her observation of fire department personnel performing CPR. The first base-line EKG was taken in the ambulance at 6:16 p.m.

**\*3** Tristen arrived at the hospital at 6:36 p.m., and she was immediately examined by Dr. John Conner, who determined that Tristen was "asystole" and without respiration, was cool to the touch, and displayed some dependent lividity, all indicating that she "had been dead for some time." Tristen was placed on monitors to assess her condition, but Conner believed that there was no chance of successful resuscitation. A nurse attempted to determine Tristen's temperature with a rectal thermometer, which continued to display its lowest possible reading of 94 degrees Fahrenheit, thereby signifying that the child's temperature was actually lower than the minimum displayed by the digital thermometer. Conner pronounced Tristen dead at 6:53 p.m. He broke the news to Hope, who was distraught and cried that she did not want to live. Conner testified that Applicant's behavior was unusual in the situation because he attempted to fondle Hope, but other witnesses disputed this testimony.

Subsequently, Justice of the Peace Edie Connelly ordered an autopsy that was performed by the Harris County Medical Examiner's Office (HCMEO),

specifically assistant medical examiner Dr. Patricia Moore. Moore noted six or seven contusions on Tristen's legs, which were consistent with normal childhood injuries. She also observed five irregularly shaped, purple bruises on Tristen's back, ranging from one-eighth to one-quarter inch in width; bruises on the right side of her neck; and areas of discoloration on her face and left arm. Moore incised the bruises on Tristen's back with a scalpel and found hemorrhages down to the level of deep subcutaneous tissue. When examining Tristen's internal organs, Moore discovered petechiae (small areas of hemorrhage) on the thymus and the lungs, a small hemorrhage on the kidney, a recent hemorrhage between the intracostal muscles of the eleventh and twelfth ribs on each side, and a hemorrhage of the tonsils. Moore stated that Tristen's heart appeared "pretty good" and the lungs contained "some mucus in the bronchi," which probably resulted from a cold. Upon further examination the next day, Moore found two additional bruises behind Tristen's right ear and another bruise on the right side of her neck.

At trial, Moore, as the State's expert witness, testified that the cause of Tristen's death was asphyxia due to compression of the chest and abdomen and that the manner of death was homicide. She explained that the presence of petechiae on the back of the thymus and lungs indicated an asphyxia-related death. Moore ruled out CPR as the cause of death because the injuries to Tristen's back were inconsistent with the administration of adult CPR and the injury to the kidney was deep down, requiring a lot of force. She also excluded sudden infant death syndrome (SIDS) because of the child's age "and the story doesn't fit the picture of a SIDS baby death." Additionally, Moore stated that Tristen may have been dead for at least three hours before her temperature was taken at the hospital, based upon an approximate post-mortem cooling rate of 1.5 degrees per hour, and that Tristen's body would not have sustained bruises as the result of the application of CPR that long after her death.

On cross-examination, Moore testified that she was assuming that the CPR took place on the floor, so Applicant asked her to imagine that it took place on a floor with sticks and rocks scattered around and that the adults performing CPR were doing so as if Tristen was a strong adult and were applying heavy force on her chest and abdomen. Moore responded that such circumstances could explain the bruises on the back but not the rib injury (although she also acknowledged that if enough pressure was applied to the abdomen, the kidney and

ribs could bruise). Moore also asserted that she was not completely excluding other reasonable hypothesis by which Tristen died. Still, it was her opinion that Tristen was asphyxiated, and she believed that beyond a reasonable doubt.

**\*4** To contravene Moore's testimony, the defense called Dr. Robert Bux, the deputy chief medical examiner for Bexar County, Texas.[4] Bux testified that the cause of Tristen's death could not be determined and that no anatomical reason demonstrated during the autopsy could have led to a specific cause of her death. Relying on a treatise, Bux explained that death from asphyxia by compression would have resulted in abundant petechiae above the level of compression (including on the forehead, cheeks, and eyes) as well as abrasions and bruises around the front of Tristen's body that would have occurred during the struggle. But Moore observed none of these during the autopsy. Bux also stated that the occasional petechiae on internal organs observed were a "non-specific finding" and could have resulted from other causes. That is, "[e]ven the presence of abundant petechiae is not a hallmark" and was not "specific for asphyxia." Regarding the time of death, Bux stated that pulseless electrical activity on Tristen's EKG charts could have occurred 30 to 40 minutes after her death, indicating that Tristen's death occurred after 5:30 p.m. when Applicant was not with the baby. When asked about the role of CPR in the injuries, Bux asserted that the bruises on Tristen's back were consistent with the administration of CPR while the child was lying on a lawn that was not prepared for that purpose. Similarly, Bux testified that the rib and kidney injuries could have been caused by frontal pressure during CPR, although he admitted that he had not personally seen a kidney injury due to such occurrence. Bux claimed that bruises can occur after death, explaining that it is possible for there to be a distribution of blood vessels and then the blood runs out and pools because of gravity.

In its rebuttal case, the State offered evidence to contradict Bux's EKG testimony. Fredregill described how the electrodes are attached and the advantages of electrodes over other types of monitors. Kelly Curry, Fredregill's supervisor and the clinical manager for EMS at Montgomery County Hospital District who was trained in and also taught how to read EKGs, testified about interference and artifacts in EKG readings. She explained that the three electrode leads attached to Tristen looked at different directions of the heart and were to be read simultaneously. She dismissed as artifacts any activity on the EKG charts because no

organized activity was represented and not all of the leads showed it. One reading did show some movement, but she attributed it to the CPR that was in progress, not heart activity. Finally, Carl Ulbrich, a physician who was working in the emergency room at the same time as Dr. Conner but was not the primary physician on Tristen's case, reviewed the records and testified that the EKG readings indicated no electrical activity except for mild interference. He noted that the up-and-down pattern on one of the EKG charts was consistent with CPR.

Applicant testified in his defense. He stated that Tristen was affectionate toward him and that on the day of her death, he did nothing to harm Tristen. In fact, he claimed that he had never struck her, abused her, disciplined her, or even raised his voice to her. Yet he admitted causing the three injuries to Tristen, blaming the incidents on his "carelessness." When asked about his turbulent relationship with Hope, Applicant denied that any stress resulted from the fact that Hope came in and out of his life, and although he participated in group counseling with her, he denied being depressed, claiming he attended merely out of concern for Hope. Applicant further commented that he would overlook a lot of things because of his love for Tristen. In addition, Applicant was questioned about the testimony of Bethune that in the month following Tristen's death, Applicant took all of the batteries out of Tristen's toys and then explained to her that "it hurt too much; he couldn't handle the guilt." Applicant responded that he removed the batteries because it hurt him to hear them go off, not due to a feeling of guilt from something that he had done.

During closing arguments, the State emphasized Moore's testimony in arguing that it was Applicant, and only Applicant, who could have caused the asphyxia-related death of Tristen. For his part, Applicant argued that if "anything, he is guilty of the offense of loving a child." Applicant put forth the SIDS scenario and emphasized that the bruises on Tristen's body could have been caused by incorrectly performed CPR efforts to save her life. He also pointed to the testimony of the two medical examiners, arguing that Bux's was the more credible opinion.

On February 22, 1999, the jury found Applicant guilty of capital murder, and Applicant was sentenced to life imprisonment. Approximately a month later, Applicant filed a motion for new trial, arguing that evidence was legally and factually insufficient to establish that

Tristen's death was a homicide, but the trial court denied the motion.

**\*5** ...

### D. Reevaluation of Autopsy Findings

In March 2007, an acquaintance of Applicant contacted the HCMEO and asked it to review Moore's findings regarding the cause of Tristen's death. The deputy chief medical examiner for Harris County, Dr. Dwayne Wolf, undertook a re-evaluation of the autopsy findings. After reviewing the testimony adduced during Applicant's trial, the autopsy report, the EMS and medical records, and the police offense report, Dr. Wolf concluded that Moore's observations during the autopsy did not support a finding that the death resulted from asphyxiation by compression or from any other specific cause. Consequently, on May 2, 2007, Wolf amended Tristen's autopsy report to reflect that both the cause and manner of death was "undetermined." And so on the following day, Justice of the Peace Edie Connelly formally reopened the inquest into Tristen's death.

Shortly thereafter, former Harris County Medical Examiner Joye Carter was asked by the Montgomery County District Attorney's Office to review Moore's autopsy report. Carter had been Moore's supervisor and had agreed with Moore's original opinion. In a May 10 letter to the district attorney, she wrote, "Upon my review of this case I would not concur with the opinion on the manner of death as a homicide but would reconsider this case as an undetermined manner," and "If the Harris County Medical Examiner intends to re-rule this case as an undetermined manner of death I would agree with that change."

Moore, too, was asked by the Montgomery County District Attorney's Office to review her autopsy report. In a May 13 letter to the district attorney, she stated,

> I believe that there are unanswered questions as to why the child died, and I still feel that this is a suspicious death of a young child. Given my review of all the material from the case file and having had more experience in the field of forensic pathology, I now feel that an opinion for a cause and manner of death of undetermined, undetermined is best for this case.

Moore explained that since her original opinion, she has had more experience, and she has reviewed additional information that suggested that the bruises could have resulted from aggressive CPR and other efforts to assist the child.[5] She emphasized that it was significant that aggressive adult-type CPR by untrained persons was performed on Tristen, a 17–month–old child.

### E. [Original] Habeas Application and Proceedings

On June 4, 2007, Applicant filed his original application for a writ of habeas corpus alleging, "Newly discovered evidence shows that no rational juror would find Applicant guilty beyond a reasonable doubt of the offense for which he was charged and convicted." About a month later, Applicant filed a supplemental application alleging that his "right to a fair trial by a fair and impartial jury ... was violated because his conviction was based on testimony material to the State's case that has now been determined to be false."

In its original response on June 25, 2007, the State recommended that Applicant be granted a new trial because his due process rights to a fair trial and impartial jury were violated. The State claimed that because it relied on Moore's original opinion in presenting its case, which has now been recanted, confidence in the outcome has been undermined. Citing *Ex parte Carmona,* 185 S.W.3d 492 (Tex.Crim.App.2006), the State wrote, "While Dr. Moore's testimony is not perjured testimony, the effect of the change in her opinion is the same—the jury was led to believe and credit facts that were not true."

**\*6** The same day, Applicant and the State filed agreed findings of fact and conclusions of law. But instead of signing them, on August 22, 2007, the trial court appointed Dr. Thomas Wheeler, the Chairman of the Department of Pathology at Baylor College of Medicine, with the task of conducting an independent pathological examination to address the following issues: (1) What is the manner of Tristen Rivet's death? (2) What is the means of Tristen Rivet's death? (3) Are the manner and means of Tristen Rivet's death able to be determined? (4) Does a change in the medical examiner's opinion about the manner and means of Tristen Rivet's death entitle Applicant to a new trial? After reviewing the autopsy file of the victim, trial testimony, and exhibits, Wheeler concluded in a September 18, 2007, letter to the trial court that the cause and manner of Tristen's death were undetermined. Wheeler asserted that "[a]lthough the autopsy performed by Dr. Moore was thorough and well documented, her conclusion that the death of Tristen

Rivet was caused by asphyxia secondary to chest compressions was not justified by the objective facts and pathological findings in this case." He could not rule out suffocation or asphyxiation as the cause of death, but he did not see any physical findings that would support any particular conclusion as to the cause of death.

In October 2007, Judge Connelly ordered that pathologist Linda Norton conduct an independent forensic examination of the evidence and submit a written report of her findings and opinion on the cause and the manner of Tristen's death.[6] On March 28, 2008, Norton reported the results of her review during a recorded telephone conference call, in which Judge Connelly and counsel for Applicant and the State participated. Norton stated that it was her opinion that Tristen's death was a homicide and that the manner of death was asphyxia by suffocation. She explained that her conclusion was supported by the petechial hemorrhages on Tristen's lungs and thymus, combined with the other evidence of trauma, and in the context of the other circumstances of Tristen's death. In addition, Norton stated that the correct rule of thumb for assessing temperature loss in a child's body after death is an approximate loss of three degrees per hour, depending upon ambient temperature and other environmental facts. Thus, combining that with Tristen's maximum rectal temperature of 94 degrees at the hospital and the descriptions of Tristen's condition by Sullivan and others, she believed that Tristen's death occurred between 2:30 and 5:00 p.m. Consequently, because the child had been dead for at least an hour before CPR was attempted, the external bruises observed during the autopsy could not have been inflicted during the CPR. Nonetheless, Norton acknowledged that she could not conclude beyond a reasonable doubt that Applicant and Applicant alone committed the homicide.

Norton also recommended that authorities investigate reports that Applicant had written something on a dollar bill and placed it in Tristen's casket at the funeral home on the date of Tristen's funeral. Ruth Hope (Barbara Hope's mother) and Shelby Becker (Barbara Hope's sister) had executed affidavits indicating that they saw Applicant writing something on a money bill and then placing it in Tristen's coffin. On April 4, 2008, Judge Connelly signed an order directing that Tristen be exhumed for the purpose of retrieving any evidence that might be found in the casket. Six days later, Tristen's remains were exhumed and remnants of a piece of paper resembling United States currency were recovered from the casket liner. Document preservation experts reported

on May 6, 2008, that no markings of any kind could be identified due to the poor condition of the paper.

Judge Connelly amended Tristen's death certificate on May 13, 2008, to correspond with Norton's opinion that Tristen's death was caused by asphyxia due to suffocation, rather than asphyxia by compression; the homicide finding was not changed. The following day, Norton executed an affidavit incorporating her conference discussion. In its May 27, 2008, supplemental response, the State was no longer willing to recommend a grant, but it agreed not to oppose Applicant's request for a new trial. It wrote that the "cause of death remains asphyxiation, albeit by suffocation rather than compression, and the manner of death a homicide as presented by the jury at Applicant's trial." On August 6, Wheeler submitted a sworn affidavit, repeating what he had said in his September letter to the trial court, adding that he disagreed with Norton's opinions. That same day, Applicant filed a memorandum on why Moore's amended autopsy should not be found credible.

**\*7** On August 13, 2008, Applicant, joined by the State, filed proposed joint findings of fact and conclusions of law, which recommended that Applicant be granted a new trial based on due process grounds and the fact that he was denied a "fundamentally fair trial and an accurate result." On August 25, Moore's sworn affidavit was filed, incorporating much of her prior letter to the district attorney. The next day, Applicant, again joined by the State, filed another set of proposed findings and conclusions. Instead of signing it, the trial court ordered that the parties engage in discovery. Moore was deposed on December 10, 2008; Wheeler on December 19, 2008; and Wolf on February 10, 2009. The trial court appointed John Milutin, an attorney experienced in the deposition of medical experts, to depose these witnesses. Norton was subpoenaed so she, too, could be deposed, but she could not be located. When the trial court granted the State's motion to depose Norton at the location of her choosing, she could not be deposed due to medical problems.[7] Instead, on December 17, 2009, Norton submitted a second affidavit in which she confirmed that she was incapable of preparing for or participating in a deposition, and she adopted and ratified under oath the statements and opinions she expressed during the previous telephone conference, including that she believed Tristen died from suffocation and that her death was homicide. Based largely on Norton's opinion, on December 22, the State filed its second supplemental response and recommended that

relief be denied. Shortly thereafter, Applicant filed an objection to Norton's affidavit, arguing that, given her unwillingness to be deposed, the trial court should not consider her affidavit.

On December 29, 2009, Judge Connelly conducted an evidentiary hearing on Applicant's motion to reopen the inquest into Tristen's death to allow consideration of additional expert medical testimony. Applicant also filed a motion to reopen the inquest into Tristen's death after her death certificate was amended to show she died of suffocation, but this motion was denied because "on the basis of examination and investigation, in the opinion of this Court, the cause and manner of the death of Tristin Skye Rivet, as shown on the amended death certificate ..., is cause: asphyxia due to suffocation, manner: homicide."

On January 15, 2010, the State filed its proposed findings of fact and conclusions of law, which recommended that relief be denied. Days later, Applicant filed his proposed findings and conclusions. On January 21, the State filed its first supplemental brief in support of its proposed findings and conclusions. While not willing to concede that Applicant properly raised a due process claim in his supplemental ground for relief, the State argued that, even if he did raise due process, the Court "has not yet held—and it seems unlikely that it will ever hold—that the Due Process Clause is violated when a witness provides, in good faith, an opinion that is believed to be true by both the witness and the prosecution at the time of trial, even if that opinion is subsequently challenged by other experts or reconsidered by the witness who offered it."

The next day, on January 22, 2010, the trial court permitted oral argument. Applicant argued that Moore's re-evaluation was newly available evidence and that *Ex parte Elizondo,* 947 S.W.2d 202 (Tex.Crim.App.1996), requires that the newly available evidence be evaluated within the four corners of the trial transcript.[8] Further, Applicant asserted that due process and fairness require that the jury have the opportunity to re-weigh the evidence. In contrast, the State contended that Applicant could not establish that he was actually innocent because the evidence is not newly discovered, the re-evaluation was not indisputable, and there was other evidence of Applicant's guilt. Regarding the due process claim, the State argued that Applicant had failed to raise it as a supplemental ground, and it doubted whether there was a legal and factual basis for his due process claim: "It's hard to believe that a violation of due process is

established by evidence that an expert opinion may have been correct or it may have been incorrect."

The trial court made twenty-two pages of detailed findings of fact, much of which is summarized above, and five pages of conclusions of law. The trial court recommended that we grant Applicant a new trial because his due process and due course of law rights were violated, as was his right to an impartial jury.[9]

**\*8** This Court denied the applicant's original application for writ of habeas corpus.[10] On September 3, 2013, the applicant filed a subsequent application for writ of habeas corpus pursuant to article 11.073 of the Texas Code of Criminal Procedure. The trial court recommended that relief be granted, and the State objected to its findings and recommendations. We ordered that the application be filed and set for submission.

### Subsequent Application for Writ of Habeas Corpus

[1] [2]This Court may consider a subsequent application only if "the current claims and issues have not been and could not have been presented previously in an original application or in a previously considered application filed under this article because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application...."[11]

As stated previously, no new factual bases for a claim have emerged since the applicant filed his original application. The question remains whether the enactment of 11.073 created a new legal basis for a claim.

Article 11.07 defines what makes a legal claim unavailable:

> For purposes of Subsection (a)(1), a legal basis of a claim is unavailable on or before a date described by Subsection (a)(1) if the legal basis was not recognized by and could not have been reasonably formulated from a final decision of the United States Supreme Court, a court of appeals of the United States, or a court of appellate jurisdiction of this state on or before that date.[12]

Article 11.073 was enacted on September 1, 2013, six years after the applicant filed his original application. Prior

to the enactment of article 11.073, newly available scientific evidence *per se* generally was not recognized as a basis for habeas corpus relief and could not have been reasonably formulated from a final decision of this Court or the United States Supreme Court, unless it supported a claim of "actual innocence" or "false testimony."[13] This Court held in the applicant's first habeas proceeding that his claim did not satisfy the requirements for either actual innocence or false testimony.[14]

Article 11.073 provides a new legal basis for habeas relief in the small number of cases where the applicant can show by the preponderance of the evidence that he or she would not have been convicted if the newly available scientific evidence had been presented at trial.

[3]An applicant also must establish "that the facts he alleges are at least minimally sufficient to bring him within the ambit of that new legal basis for relief."[15] In this case the applicant has alleged prima facie facts in his application sufficient to invoke the new law—there is arguably relevant scientific evidence that contradicts scientific evidence relied on by the state at trial, and that evidence was not available at trial because Moore re-evaluated her opinion after trial. Although similar information was presented by a defense expert at trial, Dr. Bux, the evidence at issue is the State's evidence regarding cause of death, which has been contradicted.

**\*9** The applicant has met the requirements for submission of a subsequent application, and we now proceed to consider the merits of this application.

### Article 11.073

The applicant argues he is entitled to relief under article 11.073 because Dr. Moore, the medical examiner who performed the autopsy and testified for the State, has re-evaluated her testimony and opinion and can no longer stand by her trial testimony that Tristen's death was a homicide. Moore now believes, as stated in her May 13, 2007, letter to the district attorney, "that an opinion for a cause and manner of death of undetermined, undetermined [*sic* ] is best for this case."

This evidence regarding the cause of death is relevant scientific evidence that contradicts scientific evidence relied on by the State at trial: Moore's testimony. During the applicant's trial, the State repeatedly emphasized Moore's testimony that this was homicide by asphyxiation.

We hold that article 11.073 applies to this evidence under section (a)(2).[16]

### Availability of Scientific Evidence

In order to obtain relief, the applicant must include in his application specific facts showing the "relevant scientific evidence is currently available and was not available at the time of [his] trial because the evidence was not ascertainable through the exercise of reasonable diligence by the convicted person before the date of or during [his] trial."[17]Article 11.073 (d)(1) and (2) provide guidance to the Court in how to make this determination:

> In making a finding as to whether relevant scientific evidence was not ascertainable through the exercise of reasonable diligence on or before a specific date, the court shall consider whether the scientific knowledge or method on which the relevant scientific evidence is based has changed since:
>
> (1) the applicable trial date or dates, for a determination made with respect to an original application; or
>
> (2) the date on which the original application or a previously considered application, as applicable, was filed, for a determination made with respect to a subsequent application.

Article 11.073 requires the Court to consider "whether the scientific knowledge or method on which the relevant scientific evidence is based has changed." Scientific method is defined as "[t]he process of generating hypotheses and testing them through experimentation, publication, and republication."[18]

[4]The process used by Moore did not change, and there is no argument from either the applicant or the State that methods for analyzing the cause of child death in a case like this have changed in the scientific community, as have other areas of science recently considered by this Court.[19] The remaining question before this Court is whether the "scientific *knowledge* ... on which the relevant scientific evidence is based has changed" (emphasis added).

Moore's conclusion certainly has changed, but does "scientific knowledge" apply to the knowledge of an individual?

**\*10** The United States Supreme Court defined scientific knowledge when explaining what constitutes admissible "scientific knowledge" testimony from an expert witness.

The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds." Of course, it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably, there are no certainties in science. But, in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—i.e., "good grounds," based on what is known.[20]

The Supreme Court laid out several factors for determining whether something qualifies as scientific knowledge under its definition, which are incorporated into the definition of "scientific knowledge" provided in Black's Law Dictionary:

> Knowledge that is grounded on scientific methods that have been supported by adequate validation. Four primary factors are used to determine whether evidence amounts to scientific knowledge: (1) whether it has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) the degree of acceptance within the scientific community.[21]

Moore's opinion at trial on the cause of death was admissible scientific evidence, based on inferences derived from the scientific method. Dr. Wheeler, Chairman of the Department of Pathology at Baylor College of Medicine, stated in his letter to the trial court that "the autopsy performed by Dr. Moore was thorough and well documented," but her original conclusion was not supported by the autopsy.[22]

Her new opinion that the cause of death is "undetermined," which the applicant argues is the "change in scientific knowledge," is also an inference or assertion supported by

appropriate validation based on the scientific method. Moore's revised opinion on the cause of death satisfies the requirements to be called "scientific knowledge," and thus falls within the language of article 11.073. Moore's opinion labeling cause of death as "undetermined" was not available at the time of trial because her scientific knowledge has changed since the applicable trial date.

The State argues Moore's re-evaluated opinion was available at trial because the same information was presented by the defense through Dr. Bux. We disagree. The relevant evidence is the State's evidence on Tristen's cause of death. It has changed. Moore's re-evaluated opinion on cause of death contradicts the evidence relied on by the State at trial and was not available at that time because she re-evaluated years after the trial ended.

### Admissibility and Probable Outcome

Both the State and the applicant agree that, if it had been available at trial, Moore's opinion regarding the cause of death would be admissible under the Texas Rules of Evidence.

**\*11** [5]Finally, we find on the preponderance of the evidence that, had this evidence been presented at trial, the applicant would not have been convicted. Moore's original trial testimony was the only evidence presented claiming conclusively that Tristen died as the result of a homicide. The State also emphasized her testimony in its closing statement when arguing to the jury that the applicant caused Tristen's death. It is hard to imagine any reasonable jury's returning a conviction when no one can even say confidently that a murder has been committed.

### Conclusion

We grant the applicant's request for relief, set aside the applicant's conviction in cause number 98–06–00750–CR, and order that the applicant be remanded to the Sheriff of Montgomery County to answer the charges against him.

Johnson, J., filed a concurring opinion.

Cochran, J., filed a concurring opinion, in which Price and Johnson, JJ., joined.

Keller, P.J., filed a dissenting opinion, in which Hervey, J., joined.

Meyers, J., filed a dissenting opinion.

Keasler, J., filed a dissenting opinion.

Johnson, J., filed a concurring opinion.

The various positions on statutory interpretation seem to agree that the legislative history indicates that the intent of this statute is to provide relief to those who were convicted on science or scientific methodology that is now known to be unsound.

My first observation is that "scientific method" and "scientific methodology" are not the same. "Scientific method" is the observation of some phenomenon in the world, the formulation of a theory-a possible explanation of that phenomenon-and testing of that possible explanation to see if the phenomenon is indeed explained by that theory. For example, in the 18 [th] century, inoculation against smallpox used the live smallpox virus itself, producing a high risk of contracting the disease and dying. Dr. Edward Jenner, among others, observed that milk maids who had suffered through cowpox, a relatively mild disease, did not contract small pox. His theory was that having had cowpox protected one against smallpox. He tested his theory by inoculating 24 subjects with pus from the cowpox blisters on a local milkmaid and then exposing those persons to smallpox. None of his subjects developed smallpox, thus verifying his theory. A quirk of the scientific method is that, even after the theory has been thoroughly tested and proven to be an accurate explanation of the observed phenomenon, it is still referred to as a theory, as in "the theory of gravity," even though the "theory" has become universally accepted as fact.

"Scientific methodology," on the other hand, is the means by which a theory is tested. In Jenner's cases, the methodology was to scrape pus from a human who had active cowpox and using that pus to inoculate other humans, then exposing them to smallpox to confirm that the inoculation with cowpox provided immunity to smallpox. If the theory being tested is that blood is thicker than water, the methodology is likely to involve measuring the viscosity of blood and water and comparing the results. Automobile manufacturers constantly test new theories about injury prevention and mitigation with crash-test dummies.

The words of Article 11.073 state that it "applies to relevant scientific evidence ... that was not available to be offered ... at the convicted person's trial; or ... contradicts scientific evidence relied on by the state at trial." Relief may be granted if "relevant scientific evidence is currently available and was not available at the time of ... trial because the evidence was not ascertainable through the exercise of reasonable diligence by the convicted person before the date of or during the convicted person's trial."

**\*12** "Evidence" is what is presented at trial in support of the litigants' positions. "Scientific evidence" is presented by scientists, and the content of that evidence depends on the knowledge of that particular witness about the science at issue. "Bad science" and "bad scientists" are inseparable. A scientist may not intend to present bad science, nor must that scientist be a bad scientist in every situation. Linus Pauling won a Nobel Prize in chemistry and would certainly be a good scientific witness if he testified about his work in chemistry. However, he would be a bad scientist presenting bad science if he were called as a witness to the unlimited powers of vitamin C.

Because evidence is what is presented at trial by a witness and is therefore limited by the personal knowledge of that witness, logically the statute must be intended to address the personal knowledge of scientific witnesses. Personal knowledge increases over time as one gains new knowledge and refines one's understanding of one's older knowledge. New law graduates may know book law, but most have not yet learned how to integrate book law with trial tactics. And some skills simply cannot be learned anywhere except in the crucible of practice in the real world. New lawyers are likely to lose trials that a more experienced lawyer would not, merely because they have not yet developed the interpretive skills of that more experienced lawyer. Or they might choose to try a case that a more experienced lawyer, after careful consideration of the facts, would choose to settle.

The same is true of physicians. Because of inexperience, a resident may miss a diagnosis that a more experienced doctor would have made, merely because the older doctor had seen the grouping of apparently unrelated symptoms before or was knowledgeable about uncommon diseases or just knew more about what questions to ask the patient. Some practitioners, of law or medicine, may not keep up with the current literature. The result of inexperience or out-dated knowledge may be testimony that may rightfully be called bad science, even if not intentionally so, and that

testimony may persuade a jury to convict when it should not.

This is just such a case. Testimony indicated that the child's injuries could have been inflicted intentionally, but it also indicated that the injuries could have resulted from improper CPR;[1] how much of the general public knows that CPR on infants is done with two fingers and at 100 beats per minute?[2] Only Dr. Moore testified at trial that the cause of death was homicide. Experienced pathologists testified that the cause of death could not be determined. At the time of the original trial, Dr. Moore had only 18 months of experience as an associate medical examiner and had been cited for defective and improper work. With eight more years of experience, she testified that she believed that the cause of the child's death could not be determined. That "relevant scientific evidence ... was not available at the time of the convicted person's trial," and it "was not ascertainable through the exercise of reasonable diligence by the convicted person before the date of or during the convicted person's trial;...." The only person who now clings to a firm opinion of homicide is Dr. Norton, who closed her practice, moved from her home, and declined to be deposed for a habeas hearing.

**\*13** As has been noted, some examples of "contradicted scientific evidence relied on by the state at trial" include arson, infant trauma, bullet-lead analysis, bite marks, some ballistics tests, blood-spatter patterns, and scent line-ups. Some such evidence has involved misinterpretation based on out-dated knowledge, some are simply junk science that has never been subjected to any kind of scientific investigation. Whether "debunked" or "refined" for increased accuracy, changes in scientific knowledge in general, and therefore changes in scientific testimony by individuals, must be acknowledged and addressed. As Judge Cochran noted in her dissent in applicant's original application for habeas corpus,

> When scientific experts honestly and sincerely thought "X" was true at the time they testified, but the science has changed or the experts' understanding of the science has changed and their opinions have changed, what cognizance of that change should the criminal justice system take long after a person has been convicted?

*Ex parte Robbins,* 360 S.W.3d 446, 469 (Tex.Crim.App.2011)(Cochran, J., dissenting).

The legislature has made it clear that advances in DNA technology may be the basis for re-examining convictions. Advances and changes in other forms of scientific

knowledge, and thus in scientific testimony from individuals, should also be available as bases for re-examination of convictions.

I join the opinion of the Court.

Cochran, J., filed a concurring opinion in which Price and Johnson, JJ., joined.

I join the majority opinion. I write separately to respectfully disagree with the State's contention that the plain language and legislative history of Article 11.073"demonstrate a legislative intent to provide a remedy when there is a generally accepted scientific advance or breakthrough in a discipline of forensic science," rather than a change in the State's scientific expert's opinion.[1] I think that providing relief from "bad" scientific testimony and righting the wrong of *Robbins*was "the tipping point" for passing the statute.[2]

**A. Our Prior Decision in *Robbins* was the Poster Child for Enacting Article 11.073.**

*1. The scientific and legal landscape before passage of Article 11.073.*

Over the past decade, Texas has been a national leader in addressing wrongful convictions and recognizing how bad science can lead to bad convictions. During the past ten years, all three branches of Texas government have worked to ensure the scientific integrity of Texas criminal convictions and to reassure our citizens that Texas criminal trials are fundamentally fair and reach accurate results.

In 2001, the Texas Legislature enacted Chapter 64,[3] which set up a procedure for post-conviction DNA testing. Then the Dallas District Attorney's Conviction Integrity Unit began testing stored DNA from old rape convictions and assisting in the legal exoneration of those defendants whose DNA did not match that found at the crime scene.[4]

**\*14** Those developments, plus the concern over "bad" arson science,[5] led the Legislature to create the Texas Forensics Commission in 2005 to strengthen the use of "good" science in criminal proceedings and to investigate "allegations of negligence or misconduct" in forensic sciences.[6] The increasing number of Texas exonerations led to the formation of (1) the Texas Innocence Project in 2007 by non-profit organizations working with students,

and (2) the Texas Criminal Justice Integrity Unit in 2008 by the Court of Criminal Appeals to "review the strengths and weaknesses of the Texas criminal justice system" and to "bring about meaningful reform."[7] In 2011, the Legislature passed Article 38.20 to improve the reliability of photographic and live line-up procedures,[8] based, in part, on the recommendations of the Criminal Justice Integrity Unit.[9]

In 2009, the National Research Council, an arm of the National Academy of Sciences, published *Strengthening Forensic Science in the United States: A Path Forward,* its exposé of the shoddy forensics used in criminal proceedings.[10] This report concluded that, with the exception of DNA, "no forensic method has been rigorously shown to have the capacity to consistently, and with a high degree of certainty, demonstrate a connection between evidence and a specific individual or source."[11] In other words, courts and juries were frequently relying on "junk" science in criminal proceedings.[12] The NAS report stated that "[n]ew doubts about the accuracy of some forensic science practices have intensified with the growing numbers of exonerations resulting from DNA analysis (and the concomitant realization that guilty parties sometimes walk free)."[13]

**\*15** One of the report's chapters dealt with concerns about medical examiners and coroners. It noted numerous deficiencies in the system[14] and concluded, "It is clear that death investigations in the United States rely on a patchwork of coroners and medical examiners and that these vary greatly in the budgets, staff, equipment, and training available to them, and in the quality of services they provide."[15] Part of the problem noted in the NAS Report was that there is very little forensic pathology research, especially research conducted in collaboration with universities and medical schools.[16] This led to an unhealthy reliance on law enforcement and prosecution policies and procedures rather than the best medical practices. Medical examiners, like other forensic experts, should not become the "handmaiden" of the legal system with "no significant uses beyond law enforcement."[17]

In 1989, just as DNA testing arrived in criminal cases, one prominent scientist noted, "At present, forensic science is virtually unregulated-with the paradoxical result that clinical laboratories must meet higher standards to be allowed to diagnose strep throat than forensic labs must meet to put a defendant on death row."[18] Twenty-five years later, our forensic laboratories and scientists have not changed much. Because they are not subject to significant oversight or accreditation, it is not surprising to see "bad"

science and "bad" scientific testimony in our courtrooms.

Meanwhile, Texas has continued its push to ensure that state-of-the-art science would assist in seeing that the guilty were convicted and the innocent were not, especially because more than half of all DNA exonerations involved unvalidated or improper forensic science.[19] But as the Supreme Court has explained, the problem is not just that a general forensic field may be "bad" science, the problem also includes "bad" scientists.

> Prosecution experts, of course, can sometimes make mistakes. Indeed, we have recognized the threat to fair criminal trials posed by the potential for incompetent or fraudulent prosecution forensics experts, noting that '[s]erious deficiencies have been found in the forensic evidence used in criminal trials.... One study of cases in which exonerating evidence resulted in the overturning of criminal convictions concluded that invalid forensic testimony contributed to the convictions in 60% of the cases.'[20]

The DNA exonerations have shown that faulty forensic-science testimony may be due to either (1) insufficiently reliable forensic-science disciplines, such as toolmark and firearm evidence, bullet-lead analysis, analysis of hair or fibers, analysis of paint or explosives evidence, forensic odontology, and bloodstain analysis;[21] or (2) insufficiently reliable expert testimony about an otherwise reliable forensic-science discipline.[22] This second group may include incompetent experts, scientific charlatans, and experts who intentionally withheld scientific evidence, but an empirical study of the DNA exoneration cases shows that the majority of unreliable expert testimony falls into one of six categories:

• Non–Probative evidence presented as probative;[23]
**\*16** • Exculpatory evidence discounted;[24]

• Inaccurate frequency or statistic presented;[25]¿
• Statistic provided without empirical support;[26]

• Non-numerical statements provided without empirical support;[27] and
• Conclusion that evidence originated from defendant.[28]

In general, the problem with these experts was one of "over-claiming" or scientific puffery.

**\*17** As the Supreme Court has noted, what the government calls "neutral scientific testing" is not always as neutral or scientific as the government suggests.[29] "Forensic evidence is not uniquely immune from the risk of manipulation.... A

forensic analyst responding to a request from a law enforcement official may feel pressure—or have an incentive—to alter the evidence in a manner favorable to the prosecution."[30]

In sum, the forensic-science problems that have led to wrongful convictions include both "bad" science and "bad" (although perhaps sincere and well-intentioned) scientists.[31]

Although *Daubert,*[32] *Kelly,*[33] and *Nenno,*[34] have brought judicial gatekeeping and oversight to some of the underlying forensic-science disciplines, courts do not typically examine the specific opinions and conclusions that testifying experts reach or whether their inferences are supported by their data.[35] There is no screening of the expert's case-specific inferences and opinions before the jury hears them. Yet it is precisely while the expert testifies that "the rubber meets the road," and the jury hears claims about the purported scientific significance of the evidence in the particular case.[36]

This Court has expressed its concerns about "junk" science in such cases as *Jordan v. State,*[37] and *Tillman v. State*[38]dealing with the unreliability of eyewitness identifications and the psychological factors that cause inaccurate identifications;[39] in the *Winfrey*[40] dog-scent line-up cases; in the context of psychologists testifying to a capital defendant's future dangerousness based on unreliable methods;[41] in the admission of polygraph tests;[42] and in the use of comparative bullet-lead analysis.[43] We have also recognized that sometimes the science is good, but the individual scientific testimony is "bad."[44]

**\*18** By 2009, the Texas Legislature, at the urging of the Innocence Project of Texas, began reacting to the problems of prior convictions based on bad scientific evidence. Senator John Whitmire sponsored Senate Bill 1976, a bill (after amendments) that is remarkably similar to the current Article 11.073 statute.[45] Although that bill was left pending in the House at the end of the session,[46] the bill analysis stated that Article 11.073

> would authorize courts to grant relief on writs of habeas corpus that, subject to criteria in the bill, raised relevant scientific evidence that was not available at the time of a trial or that discredited scientific evidence relied on by the prosecution at a trial.[47]

The Bill Analysis also noted that this statute was needed

because "the science surrounding arson investigations has changed dramatically in recent years" and "a technique used by the FBI to match the chemical signature of bullets has been discredited." Thus, "[d]efendants who were wrongly convicted using these and any debunked science deserve a way to raise their claim before a court."[48] The bill's emphasis was based entirely upon general changes or advances in forensic sciences-bad science, not bad scientists.

**\*19** In the next legislative session, Senator Whitmire again introduced his bill to enact a new Article 11.073.[49] During a House Committee on Criminal Jurisprudence hearing on the companion bill, HB 220, witnesses testified that molecular evaluation of paint chips, blood spatter testimony, arson, "dog bark cases," and "satanic ritual abuse of children" might all be areas of debunked scientific expertise subject to possible relief under the proposed bill. Once again, the onus was on bad forensic-science disciplines, not specific bad scientific testimony. Once again, the bill did not pass.

*2. Tipping point: the two events that led to the passage of Article 11.073.*

Two important developments occurred after the legislative session ended in May of 2011. First, we denied applicant relief on his original habeas corpus claim, which was based on the medical examiner's change of opinion from Tristen's death being "homicide" to her death being "undetermined."[50] The legislative session ended on May 30, and we delivered our 5–4 opinion denying applicant relief on June 29. I wrote a dissenting opinion, lamenting that "[o]ur criminal justice system does not currently have any legal doctrine, much less a constitutional doctrine, into which this situation falls comfortably."[51] I suggested that changes needed to be made to accommodate the situation in such cases:

> Given the current legitimate concerns about the scientific reliability of forensic science used in American courtrooms, I think that the criminal justice system needs some jurisprudential mechanism to deal with cases in which a prior conviction was based upon scientific evidence that has subsequently been found to be unreliable, in whole or in a specific case.[52]

The second development was our grant of relief in *Ex parte Henderson,*[53] under circumstances that were very similar to those in applicant's original habeas case.[54] Just eighteen months after *denying* relief in applicant's case when the medical examiner changed her opinion from "homicide" to "undetermined," we *granted* Cathy Lynn Henderson relief on her claim when the medical examiner changed his opinion from "homicide" to "undetermined." In that case, the dissent justly criticized the majority for failing to articulate a clear legal basis for granting a new trial.[55] The three dissenters in *Henderson* echoed the four different dissenters in *Robbins* in agreeing that current Texas law lacked clarity in dealing with instances in which critical scientific evidence supporting the conviction-either the scientific field itself or the expert's original opinion-had been discredited.

### 3. The 2013 Legislative Enactment of Article 11.073.

**\*20** The *Robbins* and *Henderson* decisions were the judicial landscape in which Senator Whitmire introduced—"once more unto the breach, dear friends, once more"[56]—his same habeas corpus bill to establish a legal mechanism to address claims of "false and discredited forensic testimony"[57] in 2013. The third time was a charm. And part of its charm may be attributable to (1) applicant's post-conviction lawyer testifying to the Senate Criminal Justice Committee about the 2011 *Robbins*decision, and (2) testimony by the original District Attorney who had prosecuted applicant and who, after Dr. Moore changed her opinion concerning Tristen's cause of death, agreed with the defense and the trial judge that applicant was entitled to a new trial.[58] The Bill Analysis to the 2013 bill, SB 344, emphasized this Court's decisions and referenced applicant's case:

> Recent case law and judicial opinion[s] have identified weaknesses in the current habeas corpus statute, noting issues that include the absence of statutory grounds upon which to grant relief, the speed of changing science that serves as the foundation of a conviction, and technical testimony that may change with scientific discovery. In one case, recanted testimony by a medical examiner established the basis of the state's case with respect to the cause and

manner of death, without which it would not have obtained a conviction. The Texas Court of Criminal Appeals voted against granting a new trial, with the majority finding no path to habeas relief under current law. The question was raised as to how the criminal justice system should address scenarios in which the scientific experts sincerely thought something was true at the time they testified, but the science and the experts' understanding and opinions had changed.[59]

It cannot be doubted that the Legislature had this very case in mind when it debated and enacted what is now Article 11.073. And, during the legislative session, Senator Whitmire told the Texas Tribune that "several recent Court of Criminal Appeals decisions may make [SB 344] more likely to pass."[60] The *Robbins* and *Henderson* cases raised "a novel and difficult issue for the criminal-justice system":

> When scientific experts honestly and sincerely thought 'X' was true at the time they testified, but the science has changed or the experts' understanding of the science has changed and their opinions have changed, what cognizance of that change should the criminal justice system take long after a person has been convicted?[61]

In *Robbins,* this Court chose finality over accuracy; in *Henderson* we did the opposite, and in 2013, the Texas Legislature also chose accuracy over finality by enacting Article 11.073.

### B. The term "scientific knowledge" in Article 11.073 includes both general scientific advances and specific scientific testimony.

As noted above, wrongful convictions have been based on both a "bad" forensic-science discipline, e.g., bullet-lead analysis, and "bad" scientific testimony within a good forensic discipline. As Justice Scalia has stated, "[f]orensic evidence is not uniquely immune from the risk of manipulation,"[62] or incompetence, or innocent errors, or

cognitive bias. All of these problems are flaws relating to "bad" scientific testimony that may exist within a good forensic discipline.

**\*21** This case involves "bad" scientific testimony based on insufficient experience.[63] The trial and habeas judge explicitly found that Dr. Moore

> was not competent at the time of trial to offer objective and pathologically sound opinions as to cause and manner of death in this case. Her level of inexperience at the time of trial and her bias at that time toward the state are now evident. Moore's admissions that near the time of trial she was cited for defective and improper work and was evaluated as being biased in favor of the prosecution,[64] as well as Dr. Carter's statements concerning the turbulence in the ME office in 1998, the concern about Moore being perceived as a witness for one particular side, and that (at that time) Moore was making the transition to the neutral position of a forensic pathologist cast grave doubt on Moore's opinions at trial and the reasons she gave them. This is newly discovered evidence that could not have been previously discovered by applicant.

Dr. Moore's later re-evaluation of her opinion-putting aside advocacy for one party and seeking more information to reach a more accurate result-is the hallmark of "good" scientific methodology:

> Scientists continually observe, test, and modify the body of knowledge. Rather than claiming absolute truth, science approaches truth either through breakthrough discoveries or incrementally, by testing theories repeatedly.[65]

It is not surprising, then, that the Texas Legislature would authorize this court to review convictions based upon an expert's "scientific knowledge" that the expert has since repudiated or contradicted based on her further testing, review, and experience. Indeed, what would not make sense is for the Legislature to be concerned about the

reliability of general fields of forensic science, but unconcerned about the reliability of a forensic scientist's specific testimony. Regardless of whether a conviction is based on an unreliable field of science or unreliable scientific testimony, the result is the same: an unreliable verdict that cannot stand the test of time. It is built upon the shifting sands of "junk" science or a "junk" scientist, and it is the purpose of Article 11.073 to provide a statutory mechanism for relief and a retrial based upon "good" science and "good" scientific testimony.

**\*22** With these additional comments, I join the majority opinion.

Keller, P.J., filed a dissenting opinion in which Hervey, J., joined.

The legislature passed Article 11.073 to allow a defendant to obtain habeas relief on the basis of new scientific evidence.[1] In a nutshell, the question before us is whether the statute contemplates granting relief on the basis of (1) a change in the science, or (2) a change in the opinion held by a particular expert in the science. Judge Keasler's position is that the scientific evidence is new only if there has been a change in the relevant body of scientific knowledge or in the accepted method by which a particular scientific inquiry is conducted. The Court's position is that the change can be the expert's own testimony, even if that change in testimony is based merely on the expert becoming more educated in the relevant field of study. I agree with Judge Keasler that the statute contemplates granting relief only on the basis of a change in the science.

Subsection (b) of the statute creates a claim for relief on the basis of new scientific evidence.[2] To obtain relief under Subsection (b), the applicant must show, among other things, that "relevant scientific evidence is currently available and was not available at the time of the convicted person's trial because the evidence was not ascertainable through the exercise of reasonable diligence by the convicted person before the date of or during the convicted person's trial."[3] In Subsection (d), the legislature defines what it means to say that scientific evidence was not ascertainable through the exercise of reasonable diligence:

> (d) In making a finding as to whether relevant scientific evidence was not ascertainable through the exercise of reasonable diligence on or before a specific date, the court shall consider whether *the scientific knowledge or method on which the relevant scientific evidence is*

*based* has changed since:

(1) the applicable trial date or dates, for a determination made with respect to an original application; or
(2) the date on which the original application or a previously considered application, as applicable, was filed, for a determination made with respect to a subsequent application.[4]

I agree with Judge Keasler that the phrase "the scientific knowledge or method on which the relevant scientific evidence is based" refers to general science, not an expert's particular knowledge or method of doing things. That is the natural understanding of the words in the sentence, and Judge Keasler explains in detail why the Court's contrary construction of that phrase is untenable. So, to satisfy Subsection (b)'s requirement that "the evidence was not ascertainable through the exercise of reasonable diligence by the convicted person before the date of or during the convicted person's trial," the applicant must show that the body of scientific knowledge or the accepted methodology has changed since the trial.

**\*23** While I fully agree with the first two sections of Judge Keasler's opinion, I would analyze the issue in the third section differently. That section argues that applicant is barred from filing this application because the science has not changed since his *prior application.* It is true that, in order to take advantage of Subsection (c) of Article 11.073, an applicant who files a subsequent application must show that the body of scientific knowledge or the accepted methodology has changed since his prior habeas application. Subsection (c) allows a subsequent application when a change in science occurs after the filing of the prior application.[5] But Article 11.073 did not exist when applicant filed his original application, so Subsection (b) of that article qualifies as a new legal basis under Article 11.07, § 4(a)(1) and (b).[6] Consequently, applicant's claim is authorized by Article 11.071, § 5.

Nevertheless, in order for applicant to obtain relief, his claim must qualify under Article 11.073, Subsection (b). To so qualify, applicant must show that the science has changed since his *trial.* Because he has not done so, his claim does not qualify, and this application should be dismissed.[7]

Meyers, J., filed a dissenting opinion.
Chapter 11 of the Texas Code of Criminal Procedure is devoted to writs of habeas corpus. The chapter is a creature

of the legislature and, although they may never suspend the right, the legislature may enact "laws effecting the implementation of the right to writ of habeas corpus." TEX. CONST. art. I, § 12; *Ex parte Davis,* 947 S.W.2d 216, 219 (Tex.Crim.App.1996). However, the way we have traditionally treated any writs under Chapter 11 is to measure the facts of the application against constitutional provisions to determine whether the facts have offended either the United States or Texas constitutions. Over the years, based upon this method, we have built a body of law that sets the standards by which we analyze each type of writ and establishes the specific criteria each applicant must meet in order for relief to be granted. In every case we have decided, we have relied on those standards and criteria to determine whether the facts in the applicant's case have offended constitutional provisions, and thereby warrant relief.

**\*24** In the present case, Applicant was convicted of capital murder based in part on the testimony of medical examiner Dr. Patricia Moore, who testified that the victim's death was a homicide caused by asphyxia due to compression of the chest and abdomen. Moore, however, due to her additional years of experience, no longer stands by her testimony and now believes that the child's cause and manner of death cannot be determined. In 2011, Applicant sought his first writ of habeas corpus under Texas Code of Criminal Procedure art. 11.07, alleging actual innocence and that his right to a fair trial was violated because he was convicted based on false testimony. *Ex parte Robbins,* 360 S.W.3d 446, 458, 459 (Tex.Crim.App.2011); *see*TEX.CODE CRIM. PROC. art. 11.07. We ultimately denied his application because Moore's reevalution simply stated that the manner and cause of death was "undetermined," not that Applicant could not have caused the victim's death. We held that this reevaluation did not meet the requisite showing for actual innocence and did not prove Moore's trial testimony to be false. *Id.* at 458–59, 460–63.

In 2013, the Texas Legislature decided to develop a brand new avenue for habeas relief based on developing nature of science and passed article 11.073 of the Texas Code of Criminal Procedure. In propagating this provision, however, the legislature set out the criteria that make an applicant eligible for relief, but it did not set forth any standard by which to judge an application. That is to say that there is no set constitutional provision against which we are to measure particular facts to determine whether to grant relief. Every writ this court has dealt with since Chapter 11 has been in effect has been based on analyzing whether constitutional provisions have been offended.

That is the way we have always analyzed and should always analyze applications for writ of habeas corpus. Obviously my colleagues are not offended by the legislature's intrusion on our authority, but I find the passing of article 11.073 to be a clear attempt at a power grab and believe their intent was to tell us how we should rule on these types of matters. But if the legislature wants to establish non-constitutional means for relief, it needs to arrange for the appropriate agency to handle it, such as the Board of Pardons and Paroles. In our court, we judge relief dependant upon our constitutions, and article 11.073 does not provide for relief based upon any constitutional criteria. Because I do not believe our court is the appropriate avenue for relief and Applicant's present application does not allege any new facts or rulings on constitutional law, I would deny relief. Therefore, I respectfully dissent.

Keasler, J., filed a dissenting opinion.

We filed and set Neal Robbins's writ application to consider how Texas Code of Criminal Procedure Article 11.073 applies to the facts of his case. The case presents an issue of statutory construction defined by established guidelines to an admittedly awkward statute. However, the Court applies precedent questionably and reaches an incorrect result. The Court interprets the terms "scientific method" and "scientific knowledge" in a manner that reaches an absurd result and relies upon a United Stated Supreme Court case that contradicts legislative intent. Article 11.073's legislative history suggests that its aim is to provide an avenue of relief for those convicted on science or scientific methodology subsequently found to be unsound, not an individual expert's changed testimony when the underlying science or methodology of that opinion remains valid. The Court's opinion also overlooks a potential substantive and procedural obstacle for Robbins's application, the resolution of which is necessary to grant him relief. For these reasons, I dissent.

## Scientific Method

In construing a statute, we limit our analysis to the plain meaning of the text, unless the language is ambiguous or the plain meaning leads to absurd results that the Legislature could not have possibly intended.[1] When we are called upon to go beyond the plain meaning of the text, we may consider various extratextual factors.[2] Although

left unsaid, the Court appears to finds section (d) unambiguous and attempts to define "scientific method" through a dictionary definition. Dictionary definitions are a fine way to define terms because they are ordinarily a reliable and readily available source for a term's plain and ordinary meaning.[3] But the Court's use of the Black's Law Dictionary definition of scientific method leads to an absurd result that the Legislature could not have intended, and from my reading of the statute, did not intend.

**\*25** To hold that "scientific method," as used in the statute, refers to the universally employed "process of generating hypotheses and testing them through experimentation, publication, and republication" undermines the statute's clear intent that the object of the change actually be subject to change. Section (d) requires a change in either the scientific knowledge or method: "whether the scientific knowledge or method on which the relevant scientific evidence is based has changed...." The scientific method generally—"the principles and procedure for the systemic pursuit of knowledge"[4] that instill the necessary rigor of valid discovery—is itself unchanging. Science inevitably changes; the process by which that change occurs does not. Under this definition, the Court frustrates the legislative intent and the purpose of the clear statutory scheme by requiring an inherently static concept to change before relief may be given. This is clearly not what the Legislature intended. The Court's definition of the term drains it of any substantive meaning and renders it a useless term, an interpretative result we historically are loathe to reach.[5] When section (d) is read as a whole, the more accurate definition of scientific method (and the more consistent with the apparent legislative intent) is the scientific methodology used in a particular area of scientific study. I do agree with the Court's conclusion that there is no evidence to suggest that the methods for analyzing the cause of child death have changed in the scientific community. In other words, the accepted science and methodology have not changed.

## Scientific Knowledge

The Court next sets upon determining whether Dr. Moore's new opinion qualifies as "scientific knowledge ... on which the relevant scientific evidence is based has changed." The question posed by the Court is, "Moore's conclusion certainly has changed, but does 'scientific knowledge' apply to the knowledge of an individual?"[6] It finds that it does, but it is unclear what path the Court has

taken on our established statutory-interpretation roadmap: holding that the term is unambiguous and the common understanding and usage ought to apply, or holding that the term is ambiguous and turning to case law, as an extratexual source, to define the term. Either way, I find the analysis flawed in several respects and disagree with the Court's result.

The Court finds instructive the United States Supreme Court's definition of "scientific knowledge" in its *Daubert* opinion.[7] The majority then summarily concludes that Dr. Moore's new opinion "satisfies the requirements to be called 'scientific knowledge' " because her new opinion is "an inference or assertion supported by appropriate validation based on the scientific method."[8]

The Supreme Court's opinion has no value in defining any of Article 11.073' s terms. Not only is there no explicit or implicit reference to *Daubert* in Article 11.073's language, *Daubert* itself does not stand for the proposition that expert testimony is necessarily "scientific knowledge" in and of itself. The Court's *Daubert* quotation ends too soon; it should continue as it does in that opinion: "In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." On a more fundamental level, the majority presumes the answer of the question it seeks to resolve—whether this term refers to an individual's personal knowledge or the collective knowledge of the larger scientific community. Comparing Dr. Moore's individual opinion to what the Supreme Court stated was "scientific knowledge" and finding it satisfied merely assumes that scientific knowledge means an individual opinion.

Applying *Daubert* 's definition of scientific knowledge may speak to whether Dr. Moore's new opinion would be admissible under the Texas Rules of Evidence at a trial on the date of Robbins's application—a finding a court must make under section (b)(2)—but it does nothing to define the statutory phrase in section (d). The inclusion of section (b)(2)'s requirement that the relevant scientific evidence be admissible counsels against defining scientific knowledge in this manner. We presume that the Legislature intended each part of a statute to be given effect.[9] Not only has the Court strayed from our statutory-interpretation presumptions, its analysis gets us no closer to a definition.

**\*26** I would expressly find the term ambiguous because the term's common understanding and usage offers little guidance or limitations. Based on Article 11.073's legislative history, I would hold that scientific knowledge

for purposes of this article refers to the collective knowledge within a field of study, not an individual's opinion. Judge Cochran's concurrence too looks to the statute's legislative history, but its conclusion is not supported by that history.

In 2009, Senator Whitmire first introduced a bill that was substantively identical to the language found in Article 11.073.[10] The bill contained the phrase in question—"the court shall consider whether the scientific knowledge or method on which the relevant scientific evidence is based has changed." The Senate Research Center's Bill Analysis stated Senator Whitmire's intent was to "prohibit[ ] a convicting court from denying relief on an authorized application based solely on the applicant's plea, confession, or admission .... [and] authorize[ ] a court to grant relief on the basis of relevant scientific evidence not available at the time of the convicted person's trial."[11]

The House Research Organization's Bill Analysis echoed the same sentiment. However, it went further and expressed the view of the supporters of that bill, who believed that the statute was necessary because "defendants who were wrongfully convicted using these and any debunked science deserve a way to raise their claim before the court[,]" specifically citing changes in the underlying science of arson investigation and matching chemical signatures of bullets.[12] To the extent that it is relevant, even the bill's supporters believed that the "scientific knowledge or method" addressed a broader, fundamental change in the underlying science. I agree with Judge Cochran that the bill's emphasis was on "bad science."[13]

After the 2009 bill failed to pass, Senator Whitmire filed the same bill again in 2011,[14] but no testimony nor committee action was taken on it. Action was taken, however, on Representative Pete Gallego's identical companion bill in the House.[15] In taking testimony before the House Criminal Justice Committee, Representative Gallego laid out his bill stating that the legislation's intent is to address science as it moves forward and to "keep up with the times."[16] In his discussion with other committee members, Representative Gallego specifically identified the advancement of arson science and blood-spatter analysis and explained that this legislation would give the court the ability to look at new science.[17] There was no discussion from either the committee members or witnesses supporting the bill that the design of the legislation was to grant relief based on the change of an expert's opinion absent any significant change in the underlying science or accepted methodology. Again, I

agree with Judge Cochran that the bills' emphasis was still on "bad science, not bad scientists."[18]

**\*27** In 2013, Senator Whitmire once more introduced the bill (in addition to Representative Sylvester Turner's identical companion bill) that ultimately created what is now Article 11.073.[19] However, the previous four years produced little change to the bill's text, and Article 11.073 contains the same substantive provisions as the first bill filed in 2009. At the urging of the Harris County District Attorney's Office, there were only two changes from the 2011 version: (1) changing "discredits" to "contradicts"; and (2) changing "reasonably probable" to the more familiar "upon a preponderance of the evidence" standard.[20] The Senate Research Center's Bill Analysis summarized the bill's intent as "amend[ing] the Code of Criminal Procedure relating to applications for writs of habeas corpus relief based on relevant scientific evidence of false and discredited forensic testimony.... Recent examples of such evidence include dog-scent lineups, misinterpreted indicators of arson, and infant trauma."[21]

Judge Cochran's concurring opinion quotes from the "Supporters Say" section of the House Research Organization's Bill Analysis of S.B. 344: "Recent case law and judicial opinion[s] have identified weaknesses in the current habeas corpus statute, noting issues that include the absence of statutory grounds upon which to grant relief, the speed of changing science that serves as the foundation of a conviction, and technical testimony that may change with scientific discovery."[22] Without naming the case specifically, the Bill Analysis clearly references *Robbins I*[23] by describing a case involving a medical examiner's recantation of her trial testimony and this Court's denial of relief.

Several witnesses testified before the Senate Criminal Jurisprudence Committee in support of the bill. Judge Cochran's concurrence points out two: Robbins's counsel on his original writ application and current counsel, and the former District Attorney who prosecuted Robbins and agreed with granting him relief in *Robbins I.* Robbins's counsel was the only witness who directly opined that the statute would apply to a change in an individual expert's opinion. It is also notable that counsel did not reference *Robbins I.* Whatever the effect of committee testimony regarding what a witness believes the bill does and does not do has on a proper legislative-intent analysis, it is undoubtedly at its weakest when the testimony we are asked to consider is from an interested party's own representative. Not surprisingly, it is unsatisfying to rely on Robbins's counsel's own testimony to support the conclusion that the Legislature intended the statute to apply to a changed individual's opinion.

Unfortunately, in the Senate, the lack of debate and discussion among the committee members, probing questions directed at the testifying witnesses, and any floor debate substantially hinders our ability to glean real, definitive insight on the Legislature's intent. Judge Cochran's concurrence relies in significant measure on the bill's supporters' opinions. Reviewing witness testimony can, in some instances, serve as a useful source in deciphering legislative intent. Experts in a particular field, or area of the law, can assist committee members in airing issues of concern, providing guidance, and suggesting changes to a pending bill's language. It is not unusual for a committee to take testimony from many witnesses testifying for or against a particular bill offering a number of opinions and concerns. But there is no inherent link between what a witness says about a bill and what the Legislature intends in passing it. I am less inclined to find such testimony helpful from a statutory-interpretation standpoint when the absence of committee members' substantive questions offers no insight on collective legislative concerns and the testimony has no appreciable effect on the bill's language.

**\*28** The most compelling sources available regarding Article 11.073's enactment are the authors' own statements and the committee members' questions and statements when discussing the bills. It carries much more weight than the witnesses' opinions expressed in their testimony. In a committee hearing, Senator Whitmire began by stating that S.B. 344 "will amend the Code of Criminal Procedure relating to procedures for applications for writs of habeas corpus based on relevant scientific evidence of false and contradicted forensic testimony utilized in trial to convict an individual." He continued: "Scientific evidence, such as DNA, was not always a factor in determining guilt or innocence. Today, scientific evidence has been the sole determinant of restoring liberty to an innocent person. The writ of habeas corpus is a remedy to be used when any person is restrained of their liberty. The Texas Department of Criminal Justice houses almost 152,000 inmates, and unfortunately some were wrongly convicted."[24] With the exception of the number of inmates, the second part of Senator Whitmire's statement was a verbatim restatement of how the Senate Research Center's Bill Analysis described his intent in proposing S.B.1976, the original bill he filed in 2009. The Senator's comments do not indicate that he held the same concerns that Judge Cochran ascribes to him.

In support of H.B. 967, an identical companion bill to S.B. 344, Representative Turner was more detailed in his explanation of the bill's intended purpose. He began by stating that when an individual is "convicted based on junk science or critical forensic testimony that is disproved by later scientific advancements, the courts cannot presently agree whether or not the existing law provides a basis for relief."[25] As examples of disproved science, he specifically identified discredited dog scent line-ups, misinterpreted indicators of arson, and mistaken assumptions about infant trauma. After Representative Turner's introduction of the bill, there was an exchange between Representatives Turner and Hughes in which Representative Hughes expressed his understanding that the admission of the faulty science may not have been error at trial, but the bill addresses the scenario when "better technology comes along."[26] The hearing also contained poignant questioning of testifying witness Jeff Blackburn of the Innocence Project of Texas. Representative Carter sought his insight on what section (d)'s "ascertainable through the exercise of reasonable diligence" language means and how it would practically apply. Blackburn responded that it would not open the flood gates and burden the courts, that it would "kill a lot of fake claims," and "ensure[s] that this law would only apply to new science."[27] As an example, he cited the "huge changes" in arson science, where before, in his view, it was not even a science. From Representative Turner's express intent and the comments and questions from the committee members and witnesses alike, it is clear that, while this particular bill was left pending in committee, the proposed legislation targeted past scientific evidence undermined by subsequent advances in the particular field.

Judge Cochran's belief that S.B. 344 aimed to tackle "bad scientific testimony" is contradicted by both Senator Whitmire and Representative Turner's statements, the bill's unchanged language for the past four years, and her own opinion that the 2009 and 2011 bills' emphasis was on "bad science." I find unconvincing Judge Cochran's declaration that the Legislature's intent and the bill's emphasis shifted from "bad science" to now include "bad scientist testimony" without a corresponding change in the bill's language. We can glean something about the Legislature's motivation in the language previously proposed and ultimately passed. If the Legislature intended to enable a court to grant relief on changed expert testimony alone, it could have easily said that. Instead, the legislative history suggests the Legislature's motivation was to provide a clear path to relief from convictions based on methodology and science that were already discredited—advancements in arson detection and dog-scent line-ups—and permit relief in future cases contesting convictions based on antiquated methodology and science. This motivation resulted in the passage of a bill that emphasized changing methodology and science, not an individual's singular opinion.

**\*29** From the supporters' opinions, Judge Cochran concludes that, "It cannot be doubted that the Legislature had this very case in mind when it debated and enacted what is now Article 11.073."[28] There was no public debate in the true sense, and the conclusion that the bill's passage was a result of this Court's previous cases is rank speculation. But if the Legislature was spurred into action by the bill supporters' opinions and Judge Cochran's dissenting opinion in *Robbins I* and concurring opinion in *Ex parte Henderson,*[29] why did the Legislature fail to change the bill's four-year-old text—which pre-dated both *Robbins I* and *Henderson*—to specifically provide a clear "jurisprudential mechanism"[30] to address the issue we face today?

If Article 11.073 was intended to be a response to *Robbins I,* it is not very responsive. If we accept the argument that the Legislature was trying to change the result in *Robbins I,* it would have understood the change involved was a subsequent change in the expert's trial testimony, not a change in her field of study. It is reasonable to expect a legislative response to an opinion of this Court based on a particular set of facts to come with equally particular provisions providing an avenue for relief. Explained in more detail below, it is uncertain that the statute even avails Robbins of relief based on the timing of the alleged change in scientific knowledge or method in relation to his previously considered application. What is more, if the intent of Article 11.073 was to redress a perceived wrong in *Robbins I* or more broadly grant relief based on an expert's changed testimony without a change in the underlying science, it is also reasonable to expect the bill's author to say so in laying out the bill in the committee hearing. Neither Senator Whitmire nor Representative Turner mentioned any of these alleged intentions. Instead, both authors expressed the concern Senator Whitmire harbored in 2009—"bad science."

**Potential Implications of Robbins's Original Writ Application**

Aside from the definition of "scientific knowledge or method," the statute's text poses greater uncertainty in the

statute's application and possibly grave consequences for Robbins's current application. The majority concludes "Moore's opinion labeling cause of death as 'undetermined' was not available at the time of trial because her scientific knowledge has changed since the applicable trial date."[31] But this conclusion does not consider section (d) in its entirety. For the reader's benefit, I reproduce section (d):

> (d) In making a finding as to whether relevant scientific evidence was not ascertainable through the exercise of reasonable diligence on or before a specific date, the court shall consider whether the scientific knowledge or method on which the relevant scientific evidence is based has changed since:
>
> > (1) the applicable trial date or dates, for a determination made with respect to an original application; or
> >
> > (2) the date on which the original application or a previously considered application, as applicable, was filed, for a determination made with respect to a subsequent application.

The statute provides that, to be eligible for relief on an original writ application, the scientific knowledge or method on which the relevant scientific evidence is based must have changed since trial. However, when a court is considering a previously considered application (or any subsequent application), the change must occur after the last application was filed.

Robbins's original writ application was filed on June 4, 2007, in which he claimed that Dr. Moore's testimony changed on or about May 13, 2007. This application was denied June 29, 2011. He filed the present application on September 3, 2013. Under our current jurisprudence, the present application would be considered a subsequent application. To find that the relevant scientific evidence was not ascertainable through the exercise of reasonable diligence, a court would have to find that the change in scientific knowledge or method (however that term may be defined) on which the relevant scientific evidence is based has changed after the date he filed his original application.[32] Even if we accept that Dr. Moore's changed individual opinion meets the definition of scientific knowledge or method, it appears that such a change would not satisfy section (d) because it occurred after Robbins's trial and before Robbins's original application, not after. And because a finding on "relevant scientific evidence that was not ascertainable through the exercise of reasonable diligence" is necessary to both the jurisdictional issue to address the merits of a subsequent application under section (c) and to grant relief under section (b)(2), it is an issue that the Court must answer before granting relief. The very presence of this issue questions the Court's holding that Robbins has alleged sufficient facts to bring him within the ambit of Article 11.073.[33]

### Conclusion

**\*30** Because I find the Court's statutory interpretation flawed and question its omission of any discussion of the potentially fatal substantive and procedural issues for Robbins's application, I dissent.

Footnotes

1    *Robbins v. State,* 88 S.W.3d 256 (Tex.Cr.App.2002).

2    *Ex parte Robbins,* 360 S.W.3d 446 (Tex.Cr.App.2011), *cert. denied,*—— U.S. ——, 132 S.Ct. 2374, 182 L.Ed.2d 1016 (2012).

3    McDaniel testified that she called CPS regarding Tristen's injuries, but the agency did not follow up on the case. She also claimed that she left town because she was so scared of Applicant.

4    Bux agreed that SIDS does not apply to this case. He also noted that Tristen did not die from poisoning, as per the toxicology report.

5    Although Moore claims that she was previously unaware that " 'aggressive' adult type CPR was performed by persons untrained in CPR (infant) on this 17 month child" and that "CPR was performed on a manicured lawn," she was cross-examined about such circumstances at trial. Similarly, she asserted that she has learned since her original opinion

that "a finger was placed in the child's mouth to possibly clear the airway and that back blows were done on the child prior to EMS arrival," but these facts were available to Moore, as they were facts obtained during the investigation into Tristen's death and were presented at trial.

6      Norton was paid $22,907.50 from Montgomery County general funds, the district attorney's forfeiture account, and funds budgeted to the sheriff's cold case investigation squad.

7      Norton's daughter informed the State that Norton's office administrator and close personal friend had died of an apparent self-inflicted gunshot wound at the residence she shared with Norton. Subsequently, Norton suffered from an unspecified health problem that required a "leave of absence" from her medical practice. When the court ordered that the parties take the deposition at a location of Norton's choosing, Norton had closed her office and vacated her home, so she could not be located by the investigator who sought to serve her with a copy of the court order. Norton then informed counsel by telephone that she was under a doctor's care and could not currently be medically cleared to participate in a deposition.

8      Applicant stated that by "false evidence," he meant evidence that is "interchangeable with discredited, inaccurate, incorrect, unvalid, unfounded, whatever term of art this Court chooses to use." He further noted that Moore's change of opinion was not a recantation but instead a reevaluation, so it deserved more deference.

9      *Robbins,* 360 S.W.3d at 448–57.

10     *Robbins,* 360 S.W.3d at 463.

11     TEX.CODE CRIM. PRO. 11.07, § 4(a)(1).

12     TEX.CODE CRIM. PRO. 11.07, § 4(b).

13     *SeeEx parte Binder,* 660 S.W.2d 103, 106 (Tex.Cr.App.1983) ( "the mere raising of a claim of newly discovered evidence is, standing alone, not a fit subject for the exercise of state or federal habeas corpus powers"). *See alsoEx parte Elizondo,* 947 S.W.2d 202, 205 (Tex.Cr.App.1996) (articulating the standard for a bare claim of actual innocence in post-conviction habeas proceedings); *Ex parte Ghahremani,* 332 S.W.3d 470, 478 (Tex.Cr.App.2011) (false testimony can constitute a violation of due process whether used by the State knowingly or unknowingly when there is a "reasonable likelihood" that the false testimony affected the outcome).

14     *Robbins,* 360 S.W.3d at 460, 463.

15     *Ex Parte Oranday–Garcia,* 410 S.W.3d 865, 867 (Tex.Cr.App.2013) (expanding the requirement that a subsequent writ application must allege facts sufficient to make out a prima facie case for relief under the new law the applicant is attempting to invoke to avoid dismissal under Section 4, art. 11.07).

16     "This article applies to relevant scientific evidence that: ... (2) contradicts scientific evidence relied on by the state at trial."

17     Article 11.073(b)(1).

18     BLACK'S LAW DICTIONARY 1547 (10th ed.2014).

19     *See, e.g.,Ex parte Henderson,* 384 S.W.3d 833, 833–34 (Tex.Cr.App.2012) (remanding for a new trial where new developments in the science of biomechanics led the medical examiner who testified at trial to testify at the evidentiary hearing that he now believed "there is no way to determine with a reasonable degree of medical certainty whether [his] injuries resulted from an intentional act of abuse or an accidental fall").

20     *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

21    BLACK'S LAW DICTIONARY 1004 (10th ed.2014).

22    *Seesupra* p. ——.

1    Q. Now, I'll give you another situation. An E.M.T. comes up to the location where the adults are trying to do CPR and they are putting a lot of pressure on that kid and blowing a lot harder than they should, and she says, "If she's not already dead, you're going to kill her; stop that," and proceeded to show them the proper way. Would you say that some of that could have led to injuries to the child, adults putting their full weight down and trying to revive that child?

    A. You should see it more anteriorly than posteriorly.

    Q. Pardon?

    A. You should see it more the front to the back, the injuries.

    Q. If you've got your palms on the front and you've got little rocks and sticks on the back, you'll see it on the back, you'll see it on the back, won't you?

    A. Yes. You'd see bruises on the back.

    Q. But you wouldn't necessarily see them on the front if they're pushing with their palms, would you?

    A. No.

    Q. And they could be misfiring and hitting down in the area of the eleventh and twelfth ribs and cause that sort of damage without any noticeable trauma from looking at the skin, couldn't they?

    A. If they're pushing down lower, yes.

    *Robbins v. State,* 88 S.W.3d 256, 258 (Tex.Crim.App.2002).

2    "Give 30 gentle chest compressions at the rate of at least 100 per minute. Use two or three fingers in the center of the chest just below the nipples. Press down approximately one-third the depth of the chest (about 1 and a half inches)." http:// depts.washington.edu/learncpr/index.html (University of Washington)

    "Place 2 fingers on the breastbone-just below the nipples. Make sure not to press at the very end of the breastbone. Keep your other hand on the infant's forehead, keeping the head tilted back. Press down on the infant's chest so that it compresses about 1/3 to 1/2 the depth of the chest. Give 30 chest compressions. Each time, let the chest rise completely. These compressions should be FAST and hard with no pausing. Count the 30 compressions quickly: '1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,1, off.' " http:// www.nlm.nih.gov/medlineplus/ency/article/000011.htm (National Institutes of Health)

1    State's Brief at 11–12.

2    *See* Jani Jo Maselli, *Junk Science and the New Habeas Law,* 51 HOUS. LAWYER 16, 16 (Feb.2014) ("The tipping point in the passage of the statute was most likely the procedurally-complex case of Neal Hampton Robbins.").

3    TEX.CODE CRIM. PROC. arts. 64.01–64.05.

4    *See, e.g.,Ex parte Wallis,* No. AP–75586, 2007 WL 57969, at *1 (Tex.Crim.App. Jan. 10, 2007) (not designated for publication); *Ex parte Smith,* No. AP–75573, 2006 WL 3691244, at *1 (Tex.Crim.App. Dec. 13, 2006) (not designated for publication); *Ex parte Henton,* No. AP–75344, 2006 WL 362331, at *1 (Tex.Crim.App. Feb. 15, 2006) (not designated for publication) (based on exculpatory DNA test results, granting habeas relief to Dallas inmate who had been wrongly convicted of sexual assault).

5    Arson science came to the public's attention after the execution of Cameron Todd Willingham and the concern that he may have been convicted of the capital murder of his three children based on outmoded arson theories and techniques. *See Hon.* Juan Hinojosa & Lynn Garcia, *Response,Improving Forensic Science Through State Oversight: The Texas Model,* 91 TEX. L.REV.*SEE ALSO* 19, 32 (2012) (noting that "the recommendations generated in the final report of the Willingham case have positioned Texas as a leader in improving the quality and reliability of fire and arson investigation. The discipline of arson investigation has undergone significant transformation over the last two decades as experts have learned more about the way fire behaves. This phenomenon has affected arson investigators in *every state.* However, *no other state* is taking such proactive measures as Texas."); *see also*Peter A. Chickris & Mykal J. Fox, *Present Danger: Preventing Wrongful Convictions by Resolving Critical Issues Within Texas's Criminal Justice System,* 52 S. TEX.

L.REV. 365, 405 (2011) (recounting the facts leading to the conviction and execution of Willingham-as well as the subsequent exoneration of Ernest Willis-who was convicted on the basis of "faulty" arson science).

6   Texas Forensic Science Commission, *About Us,* http:// www.fsc.texas.gov/about.

7   Texas Court of Criminal Appeals, Texas Criminal Justice Integrity Unit, http://www.txcourts.gov/cca/texas-criminal-justice-integrity-unit.aspx.

8   TEX.CODE CRIM. PROC. art. 38.20 ("Photograph and Live Lineup Identification Procedures").

9   Texas Criminal Justice Integrity Unit, 2007 Annual Report of Activity, http://www.cca.courts.state.tx.us/tcjiu/reports/TCJIU–2009–report.pdf at 7 ("The TCJIU encourages law enforcement entities to follow the lead of Richardson, Dallas, and other jurisdictions that have voluntarily reformed their eyewitness identification procedures. The TCJIU is collaborating with other members of the criminal justice system to develop legislation that will address this issue statewide.").

10  NATIONAL RESEARCH COUNCIL, STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD (National Academies Press 2009) ("NAS Report").

11  *Id.* at 7.

12  According to the NAS Report, the situation is "different in civil cases. Plaintiffs and defendants, equally, are more likely to have access to expert witnesses in civil cases, while prosecutors usually have an advantage over most defendants in offering expert testimony in criminal cases. And, ironically the appellate courts appear to be more willing to second-guess trial court judgments on the admissibility of purported scientific evidence in civil cases than in criminal cases." *Id.* at 11.

13  *Id.* at 37.

14  These deficiencies included, among others,
    • "inadequate expertise to investigate and medically assess decedents;"
    • "inadequate technical infrastructure (laboratory support);"
    • "inadequate training of personnel in the forensic science disciplines;"
    • "lack of best practices and information standards;" and
    • "lack of quality measures and control[.]"
    *Id.* at 250–51.

15  *Id.* at 250.

16  *Id.* at 261–62.

17  *Id.* at 52.

18  Eric S. Lander, *DNA Fingerprinting on Trial,* 339 Nature 501, 505 (1989).

19  *Melendez–Diaz v. Massachusetts,* 557 U.S. 305, 319, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009) (citing Garrett & Neufeld, *Invalid Forensic Science Testimony and Wrongful Convictions,* 95 VA. L. REV. 1, 14 (2009)).

20  *Hinton v. Alabama,* ––– U.S. ––––, 134 S.Ct. 1081, 1090, 188 L.Ed.2d 1 (2014) (citation omitted).

21  *See generally* The NAS Report, *supra* note 10, at 127–83 (setting out and describing various forensic-science disciplines whose reliability has not been systematically established). The problem with most of these fields, according to the report,

is that

they are based on observation, experience, and reasoning without an underlying scientific theory, experiments designed to test the uncertainties and reliability of the method, or sufficient data that are collected and analyzed scientifically.

*Id.* at 128.

22    See Margaret A. Berger, *The Impact of DNA Exonerations on the Criminal Justice System,* 34 J.L. MED. & ETHICS 320, 322 (2006) (noting investigations of forensic science "mistakes due to the incompetence or fraud of particular analysts," some of which "have gone on for years," concluding that "these alarming reports about the erroneous results issuing from crime laboratories reflect pervasive problems with regard to the hiring, training, supervision, and review of personnel"); *see also*Paul C. Giannelli, *Wrongful Convictions and Forensic Science: The Need to Regulate Crime Labs,* 86 N.C. L.REV. 163, 165–69 (2007) (describing news reports of the Houston Police Department Crime Lab scandal and other forensic-evidence scandals and insufficient oversight efforts in various jurisdictions; "[s]ome of the crime lab failures involved incompetence and sloppy procedures, while others entailed fraud, but the extent of the derelictions-the number of episodes and the duration of some of the abuses, covering decades in several instances-precludes dismissal of the controversy as the errant work of only a 'few bad apples' ").

23    Garrett & Neufeld, *supra* note 19, at 16–17 (this category includes the inaccurate use of population data, suggesting that the rarity of finding "X" is much greater than it is; for example, an expert witness might testify that the rapist was blond, this defendant is blond and only an infinitesimal percentage of the population is blond, therefore the defendant probably is the rapist).

24    *Id.* at 18 (for example, the expert suggests that when blood found at the scene does not match that of the defendant, it must not have been left there during the crime itself).

25    *Id.* (for example, the expert inadvertently divides the frequency of finding "X" in half, suggesting that his finding has more significance than it actually does).

26    *Id.* (for example, the expert just "makes up" a statistical probability, such as the likelihood of this hair coming from someone other than the defendant is 1 in 10,000).

27    *Id.* at 19 (for example, using such terms as "highly likely," "very probably," "consistent with," when there was no empirical data to support any such conclusion).

28    *Id.* at 20 (for example, an expert states that the bitemark on the victim was made by the defendant when there is no empirical data to support such a finding).

29    *Melendez–Diaz v. Massachusetts,* 557 U.S. 305, 318, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009).

30    *Id.*

31    If the science is valid and reliable, but the scientist is not up to the task at hand, the problem is with his testimony, not with the science itself. *See* Simon Cole, *Where the Rubber Meets the Road: Thinking About Expert Evidence as Expert Testimony,* 52 VILL. L.REV.. 803, 819–24 (2007) ("Judges assume that their work is done once they have ruled proffered evidence admissible or inadmissible" instead of assessing whether the expert's testimony fits the task at hand).

32    *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

33    *Kelly v. State,* 824 S.W.2d 568 (Tex.Crim.App.1992).

34    *Nenno v. State,* 970 S.W.2d 549 (Tex.Crim.App.1998).

35    Cole, *supra* note 31, at 819–24.

36     *Id.*

37     928 S.W.2d 550 (Tex.Crim.App.1996) (discussing the importance of assessing the reliability of scientific evidence and how trial judges must act as gatekeepers to weed out "junk" science; concluding that the scientific testimony of a psychologist on the reliability of eyewitness identification is relevant and may be admissible).

38     354 S.W.3d 425, 435–36 (Tex.Crim.App.2011) (holding that psychologist's testimony on the reliability of eyewitness testimony was both relevant and reliable, and thus should have been admitted); *see also State v. Esparza,* 413 S.W.3d 81, 94 (Tex.Crim.App.2013) (Hervey, J., concurring) (expressing concern that defendants may be convicted on the basis of "junk" science if trial judges do not have the authority to *sua sponte* conduct a gatekeeping hearing into the scientific reliability of offered evidence; "The real losers of this decision will be criminal defendants convicted on "junk" science; the residents of the convicting county; the people that expended time, effort, and money at the original trial; and the State of Texas.").

39     According to the Innocence Project, "[e]yewitness misidentification is the single greatest cause of wrongful convictions nationwide, playing a role in 72% of convictions overturned through DNA testing." Innocence Project, Eyewitness Misidentification, http:// www.innocenceproject.org/understand/Eyewitness–Misidentification.php. According to one law review article, 82% of the first 38 Texas convictions that DNA exonerated were based on erroneous eyewitness identification. Chrickras & Fox, *supra* note 5, at 369.

40     *Megan Winfrey v. State,* 393 S.W.3d 763 (Tex.Crim.App.2013) (evidence that dogs alerted to defendant's scent and weak corroborating evidence legally insufficient to support capital-murder conviction); *Richard Winfrey v. State,* 323 S.W.3d 875 (Tex.Crim.App.2010) (same).

41     *Coble v. State,* 330 S.W.3d 253, 270–80 (Tex.Crim.App.2010) (forensic psychiatrist's testimony concerning defendant's future dangerousness was not sufficiently reliable to be admissible).

42     *Leonard v. State,* 385 S.W.3d 570 (Tex.Crim.App.2012) (reversing probation revocation based on therapist's testimony that defendant failed to "show no deception" on five polygraph tests).

43     *Gonzales v. State,* No. PD–1661–09, 2010 WL 711783 (Tex.Crim.App. Feb. 24, 2010) (not designated for publication) (Cochran, J., concurring).

44     *See, e.g., Ex parte Coty,* 432 S.W.3d 341, 343 (Tex.Crim.App.2014) (holding that a defendant may prove a due-process violation caused by the malfeasance of a forensic laboratory technician if he establishes an inference of falsity and proves that the "false" evidence was material to his conviction).

45     That bill, introduced and then amended during the 81 st regular session, read as follows:
       Art.11.073 PROCEDURES RELATED TO CERTAIN SCIENTIFIC EVIDENCE.
          (a) This article applies to relevant scientific evidence that:
             (1) was not available to be offered by the convicted person at the convicted person's trial; or
             (2) discredits scientific evidence relied on by the state at trial.
          (b)A A court may grant a convicted person relief on an application for a writ of habeas corpus if the convicted person files an application, in the manner provided by Article 11.07,11.071, or 11.072, containing sufficient specific facts indicating that:
             (1)A relevant scientific evidence is available and was not available at the time of the convicted person's trial because the evidence was not ascertainable through the exercise of reasonable diligence by the convicted person before the date of or during the convicted person's trial;
             (2) the scientific evidence would be admissible under the Texas Rules of Evidence at a trial held on the date of the application; and
             (3)A the court finds that, had the scientific evidence been presented at trial, it is reasonably probable that the person would not have been convicted.
          (c)A For purposes of Section 4(a)(1), Article 11.07, Section 5(a)(1), Article 11.071, and Section 9(a), Article 11.072, a claim or issue could not have been presented previously in an original application or in a previously considered application if the claim or issue is based on relevant scientific evidence that was not ascertainable through the

exercise of reasonable diligence by the convicted person on or before the date on which the original application or a previously considered application, as applicable, was filed.

(d)A In determining whether relevant scientific evidence was not ascertainable through the exercise of reasonable diligence on or before a specific date, the court shall consider whether the scientific knowledge or method on which the relevant scientific evidence is based has changed since:

(1)A the applicable trial date or dates, for a determination made with respect to an original application; or

(2)A the date on which the original application or a previously considered application, as applicable, was filed, for a determination made with respect to a subsequent application.

46 The Legislature did, however enact House Bill No. 498, which created the Timothy Cole Advisory Panel on Wrongful Convictions. Part of that panel's legislative mandate was to investigate "the effects of state law on wrongful convictions, as determined based on state statutes regarding ... writs of habeas corpus based on relevant scientific evidence." Tex. H.B. 498, 2009 Tex. Gen. Laws 1256, 81st Leg. R.S. (2009).

47 House Research Organization, Bill Analysis, Tex. S.B.1976, 81st Leg. R.S. (2009).

48 *Id.* at 3. Testimony in the Senate Criminal Justice Committee also mentioned problems with serology evidence and firearms. Scott Henson testified before the House Committee on Criminal Jurisprudence and explained why the proposed statute dealt with all types of forensic science, rather than any specific field:

We don't want to have to come back and ask y'all to pass a new law for, or a new chapter 65 for bullet lead analysis, and chapter 66 for arson, and chapter 67 for whatever the next thing is. And so what this [bill] does is create a mechanism to evaluate discredited scientific evidence without it being specific to one type of forensics.

SB 1976, House Committee on Criminal Jurisprudence, May 6, 2009.

49 The bill was substantively the same as that introduced in 2009, but there were minor differences in the division of the subsections.

50 *Ex parte Robbins,* 360 S.W.3d 446 (Tex.Crim.App.2011).

51 *Id.* at 470 (Cochran, J., dissenting). The problem was not that the science of determining the cause of death had changed, but that the medical examiner who had done the autopsy and originally determined that Tristen's death was a homicide had, after many more years of experience, reviewing additional scientific materials and the trial testimony, changed her opinion and agreed with four other pathologists-Dr. Bux, Dr. Carter, Dr. Wolf, and Dr. Wheeler-who had concluded that they could not scientifically determine the cause of Tristen's death. *Id.* at 468. The legal problem is that the verdict was no longer reliable.

The result in this case is not "patently inaccurate." Yet its accuracy is clearly open to dispute. How should the habeas case be resolved when the prior verdict might have seemed accurate at the time, but everyone later recognizes that it might not have been accurate because it was based upon scientific expertise that has been rejected-either by the scientific community or the original scientist herself?

*Id.* at 470–71. I had concluded that, since there was no statute that addressed the problem, courts should "fall back upon the wisdom and experience of the habeas judge-the 'Johnny–on–the–Spot' factfinder to whom we will defer whenever the record supports his essential factual findings." *Id.* at 472. In this case, the trial judge had recommended granting relief and giving applicant a new trial. *Id.* at 473–76. A majority of the Court did not agree with the trial judge.

52 *Id.* at 471 (footnote omitted).

53 *Ex parte Henderson,* 384 S.W.3d 833 (Tex.Crim.App.2012).

54 In *Henderson,* a majority of this Court granted relief in a short *per curiam* opinion, while Judge Price wrote a concurring opinion; I wrote a concurring opinion joined by Judges Womack, Johnson, and Alcala; Judge Alcala wrote a concurring opinion; Judge Keasler wrote a dissenting opinion joined by Presiding Judge Keller and Judge Hervey; and Judge Hervey wrote a dissenting opinion joined by Presiding Judge Keller and Judge Keasler. *Id.*

Cathy Lynn Henderson was convicted of the capital murder of the child for whom she babysat. At trial, the medical examiner had testified that the defensive theory that the child's fatal head injury was from an accidental fall was "false" and "impossible," but at the habeas hearing he testified that, based on new biomechanical studies, he could not

determine whether the child's injuries were caused by an accidental or intentional act. *Id.* at 833–34.

The only factual difference between the *Henderson* case and applicant's is that, in the former, the medical examiner changed his opinion based on advances in the scientific field of biomechanics, while in the latter, the medical examiner changed her opinion based upon her eight additional years of experience in the field, reviewing additional materials, and consulting with other pathologists.

55 *Id.* at 852 (Keasler, J., dissenting); *id.* at 859 (Hervey, J., dissenting) ("Something is missing here. While the Court states that it accepts the trial court's recommendation granting relief, it does so without providing any legal basis for that ruling, and I cannot find a ground upon which relief should be granted. And to justify its decision, the Court makes a quantum leap from 'advances in science' to granting relief, which presents a whole new dilemma for the criminal justice system and this case in particular.").

56 WILLIAM SHAKESPEARE, HENRY V, act 3, sc. I, line 1.

57 House Research Organization, Bill Analysis, Tex. S.B. 344, 83rd Leg. R.S. at 2 (2013).

58 *See* State's Brief at 27–29 (summarizing the testimony at the March 12, 2013 meeting of the Senate Criminal Justice Committee).

59 Bill Analysis, *supra* note 57, at 2–3 ("Supporters Say").

60 Maurice Chammah, *Bill Addresses Changing Science in Criminal Appeals,* The Texas Tribune, Feb. 4, 2013, *available at* http:// www.texastribune.org/2013/02/04/criminal-justice-advocates-renew-call-flawed-scien/.

61 *Robbins,* 360 S.W.3d at 469 (Cochran, J., dissenting).

62 *Melendez–Diaz v. Massachusetts,* 557 U.S. 305, 318, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009).

63 This is not the only case in which Dr. Moore's conclusions had been questioned during the early years of her medical-examiner practice. She was the medical examiner in the Brandy Dell Briggs case and declared that the death of Ms. Briggs's infant son was a homicide. *Ex parte Briggs,* 187 S.W.3d 458, 463 (Tex.Crim.App.2005). Ms. Briggs originally pled guilty to injury to a child, but later filed a writ application alleging ineffective assistance of counsel for failing to retain an expert to read and interpret the child's medical records. After other more experienced pathologists and doctors investigated and determined that the infant had suffered a natural death from septicemia originating with an undiagnosed urinary tract infection, Dr. Moore admitted that "another opinion from an outside source would be of utmost importance.... Someone with more experience (performed several autopsies on pediatric cases for years) and more expertise (in neuropathology and/or pediatric pathology or pediatrics) than I could help resolve the issues involved in this case." *Id.* at 463 n. 9. We noted in that case that "[t]he original pathologist is no longer with the Medical Examiner's Office. Applicant introduced numerous official Harris County Medical Examiner's Office 'conduct counseling' reports in the writ hearing concerning the purported deficient performance in various cases by the original pathologist." *Id.*

In a parental-rights-termination case, Dr. Moore also declared that a child's death was a "homicide due to complications from blunt force trauma to the abdomen, even though there were no bruises to her abdomen." *In re J.L.,* 127 S.W.3d 911, 915 (Tex.App.-Corpus Christi 2004), *rev'd* 163 S.W.3d 79 (Tex.2005). The court of appeals reversed the termination of the mother's parental rights based on expert testimony that contradicted Dr. Moore's and had been given in the father's criminal prosecution. *Id.* at 918. The Texas Supreme Court reversed the court of appeals because that court had improperly taken judicial notice of the expert testimony in a different, criminal proceeding. 163 S.W.3d at 88–89. Based on the testimony admitted in the mother's civil case, the evidence was legally sufficient to support the termination of rights to the mother's other child. *Id.* Dr. Moore and her "homicide" cause-of-death opinions were questioned in other cases as well. Andrew Tilghman, *Several Autopsies by Former Examiner Reviewed,* HOUS. CHRON. July 22, 2004, http:// chron.com/news/houston–texas/article/Several–autopsies–by–former–examiner–reviewed–1520093.php.

64 The NAS Report notes that "cognitive bias" is a common source of errors in scientific testimony. It explains that
[s]uch cognitive biases are not the result of character flaws; instead, they are common features of decisionmaking,

and they cannot be willed away. A familiar example is how the common desire to please others (or avoid conflict) can skew one's judgment if co-workers or supervisors suggest that they are hoping for, or have reached, a particular outcome.

NAS Report, *supra* note 10, at 122.

65    *Id.* at 112. The report explained the self-correcting nature of science which

has had to develop means of revisiting provisional results and revealing errors before they are widely used. The processes of peer review, publication, collegial interactions (e.g., sharing at conferences), and the involvement of graduate students (who are expected to question as they learn) all support this need. Science is characterized also by a culture that encourages and rewards critical questioning of past results and of colleagues.

*Id.* at 125.

1    *See*TEX.CODE CRIM. PROC. art. 11.073.

2    *Id.* art. 11.073(b).

3    *Id.* art. 11.073(b)(1)(A).

4    *Id.* art. 11.073(d) (emphasis added).

5    *Id.* art. 11.073(c) ("For purposes of Section 4(a)(1), Article 11.07, Section 5(a)(1), Article 11.071, and Section 9(a), Article 11.072, a claim or issue could not have been presented previously in an original application or in a previously considered application if the claim or issue is based on relevant scientific evidence that was not ascertainable through the exercise of reasonable diligence by the convicted person on or before the date on which the original application or a previously considered application, as applicable, was filed.").

6    *See id.*art. 11.07, § 4(a)(1) ("If a subsequent application for a writ of habeas corpus is filed after final disposition of an initial application challenging the same conviction, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that ... the current claims and issues have not been and could not have been presented previously in an original application or in a previously considered application filed under this article because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application."), (b) ("For purposes of Subsection (a)(1), a legal basis of a claim is unavailable on or before a date described by Subsection (a)(1) if the legal basis was not recognized by or could not have been reasonably formulated from a final decision of the United States Supreme Court, a court of appeals of the United States, or a court of appellate jurisdiction of this state on or before that date.").

7    *See*Ex parte Oranday–Garcia, 410 S.W.3d 865 (Tex.Crim.App.2013) (applicant must make out a prima facie case for relief under the new law he identifies to avoid dismissal under subsequent-application prohibitions).

1    *Boykin v. State,* 818 S.W.2d 782, 785 (Tex.Crim.App.1991).

2    *Ex parte Rieck,* 144 S.W.3d 510, 512 (Tex.Crim.App.2004).

3    *See, e.g.,Dobbs v. State,* 434 S.W.3d 166, 171 (Tex.Crim.App.2014); *Watson v. State,* 369 S.W.3d 865, 870 (Tex.Crim.App.2012); *Boykin,* 818 S.W.2d at 786.

4    "Scientific Method." *Merriam–Webster.com,* http:// www.merriam-webster.com/ dictionary/scientific method (last visited October 8, 2014).

5    *See, e.g.,Clinton v. State,* 354 S.W.3d 795, 801–802 (Tex.Crim.App.2011); *Garza v. State,* 213 S.W.3d 338, 349 (Tex.Crim.App.2007) ("We must presume that 'in enacting a statute, the Legislature intends the entire statute to be effective[,]' and did not intend a useless thing.").

6      *Ante,* op. at ——.

7      *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (outlining factors that bear on the admissibility of scientific evidence under Federal Rule of Evidence 702).

8      *Ante,* op. at —— – ——.

9      *Garza,* 213 S.W.3d at 349.

10      *Compare* Tex. S.B.1976, 81st Leg., R.S. (2009) *with* Acts 2013, 83rd Leg., ch. 41 (S.B.344), § 1 (effective Sept. 1, 2013).

11      Senate Research Center, Bill Analysis, Tex. S.B.1976, 81st Leg. R.S. at 1 (2009).

12      House Research Organization, Bill Analysis, Tex. S.B.1976, 81st Leg. R.S. at 3 (2009).

13      *Ante,* op. at —— – —— (Cochran, J., concurring).

14      Tex. S.B. 317, 82nd Leg., R.S. (2011).

15      Tex. H.B. 220, 82nd Leg., R.S. (2011).

16      Hearing on H.B. 220 Before the House of Represenative Committee on Criminal Jurisprudence, 82nd Leg., R.S. (Feb. 22, 2011) *available at* http://www.house.state.tx.us/video-audio/committee-broadcasts/82 (statement from author Rep. Pete Gallego) (self-transcribed).

17      *Id.*

18      *Id.* at 13 (Cochran, J., concurring).

19      Acts 2013, 83rd Leg., ch. 41 (S.B.344), § 1 (effective Sept. 1, 2013).

20      Hearing on S.B. 334 Before the Senate Committee on Criminal Justice, 83rd Leg., R.S. (Mar. 12, 2013) (statement from Justin Wood, Harris County Criminal District Attorney's Office).

21      Senate Research Center, Bill Analysis, SB 344, 83rd Leg.

22      *Ante,* op. at —— (Cochran, J., concurring).

23      *Ex parte Robbins,* 360 S.W.3d 446 (Tex.Crim.App.2011).

24      Hearing on S.B. 334 Before the Senate Committee on Criminal Justice, 83rd Leg., R.S. (Mar. 12, 2013) *available at* http://www.senate.state.tx.us/avarchive/yr=2013 (statement from author Sen. John Whitmire) (self-transcribed).

25      Hearing on H.B. 967 Before the House of Representatives Committee on Criminal Jurisprudence, 83rd Leg., R.S. (April 23, 2013) *available at* http://www.house.state.tx.us/video-audio/committee-broadcasts/83 (statement from author Rep. Sylvester Turner) (self-transcribed).

2014 WL 6751684

26      *Id.*(testimony of Rep. Sylvester Turner) (self-transcribed).

27      *Id.* (testimony of Jeff Blackburn of the Innocence Project of Texas) (self-transcribed).

28      *Ante,* op. at ——.

29      384 S.W.3d 833, 837 (Tex.Crim.2012) (Cochran, J., concurring).

30      *Ante,* op. at ——.

31      *Ante,* op. at ——.

32      *See*TEX.CODE.CRIM. PROC. art. 11.073(d).

33      *See*Ex parte Oranday–Garcia, 410 S.W.3d 865, 867 (Tex.Crim.App.2013).

---

        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---